899 F.2d 15
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
WARNER BROTHERS WELL DRILLING, INC., Defendant,
Raymond Carr Drilling Company, Raymond Carr and Jerry Carr,
Defendants-Appellants.
 No. 89-5494.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1990.
 
 Before BOYCE F. MARTIN, Jr. and WELLFORD, Circuit Judges, and LIVELY, Senior Circuit Judge.
 LIVELY, Circuit Judge.
 
 
 1
 This case arose under the Federal Water Pollution Control Act, as amended, 33 U.S.C. Sec. 1251 et seq. (1982). The question is whether a drilling company hired by the owner of an oil well to drill the well is jointly liable with the owner for the cost of cleaning up an oil spill that occurs while the drilling company is drilling the well with its equipment. More specifically, the question is whether the drilling company is an "operator" within the provision of the Act placing joint liability on the "owner or operator" of a facility from which oil is discharged. The district court found joint liability and granted summary judgment for the government. The drilling company appeals and we affirm.
 
 I.
 
 2
 Warner Brothers Well Drilling, Inc. (Warner) owned an oil well in Clinton County, Kentucky, that was initially drilled by Earl Mullins. The well did not produce oil, and Warner hired Raymond Carr Drilling Co. (Carr) to deepen the well. Under the agreement Carr provided its drilling rig with crewmen to Warner for a fee of $150 per hour. On March 26, 1982, an oil flow came from the well bore while a Carr employee was operating the drilling rig. The oil came to the surface and eventually approximately 5,000 gallons escaped. Some of the oil flowed into Pickens Branch, a tributary to navigable waters of the United States. When neither Warner nor Carr cleaned up the spill, the Environmental Protection Agency secured a cleanup at a cost of $54,207.57.
 
 
 3
 In an amended complaint the government sought recoupment against Warner and Carr pursuant to 33 U.S.C. Sec. 1321(f)(2), which provides in pertinent part:
 
 
 4
 Except where an owner or operator of an onshore facility can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner of operator of any such facility from which oil ... is discharged in violation of subsection (b)(3) of this section shall be liable to the United States Government for the actual costs incurred ... for the removal of such oil....
 
 
 5
 Warner and Carr cross-claimed against each other in addition to pleading defenses to the government's claim.
 
 
 6
 The government and Carr filed cross-motions for summary judgment. Initially, the district court granted the government's motion against Warner and Carr's motion against the government. Upon reconsideration, however, the court granted the government's motion for relief from judgment, setting aside its previous order granting Carr summary judgment on the government's claim against it.
 
 
 7
 After Carr had responded to requests for admissions and both parties had filed affidavits, the district court entered summary judgment in favor of the government. The court concluded that there were no genuine issues of material fact and that the following facts were undisputed:
 
 
 8
 1. Warner Brothers Well Drilling, Inc. (hereinafter "Warner Bros.") owned a one-half leasehold in the mineral rights to a piece of property in Clinton County, Kentucky.
 
 
 9
 2. Warner Bros. employed Carr to deepen a non-producing well on the property approximately 700 feet. Carr was to be paid $150.00 per hour for rental of Carr's drilling rig and Carr's operation of the rig at the well site.
 
 
 10
 3. On or about March 26, 1982, Paul A. Sipe was operating the Carr drilling rig deepening the well hole under the supervision of Stan Czyz of Warner Bros. Sipe was an employee of Carr.
 
 
 11
 4. Oil came to the surface at approximately 3:00 p.m. on March 26, 1982. Later that evening the well began overflowing. The overflow was not controlled or contained. Approximately 5,000 gallons of oil were discharged from the well.
 
 
 12
 5. Some of the oil flowed into Pickens Branch, a tributary to navigable waters of the United States. The oil created a visible sheen on the surface of the water.
 
 
 13
 6. The United States secured clean up of the spill at a cost of $54,207.57.
 
 
 14
 On the basis of these facts, the district court concluded that Warner was the "owner" of an "onshore facility" within the meaning of the Act, and that Carr was an "operator" of the facility at the time of the spill. Thus, the court held, the government was entitled to joint judgment against Warner and Carr as a matter of law.
 
 II.
 
 15
 On appeal Carr argues, as it did in the district court, that summary judgment was not proper because there was a dispute as to a material fact--whether it was an "operator" within the meaning of the Act. The main thrust of its argument is that Warner was in complete control of the drilling operation and thus the operator as well as the owner, even though Carr was performing the deepening with its machinery and its employees.
 
 A.
 
 16
 Carr relies on legislative history for the proposition that one who is not totally responsible for the operation of a facility is not an operator. We do not believe it is necessary to rely on legislative history to find the meaning of "operator" as used in the Act. A court first looks to "the language of the statute itself" to determine its meaning, and when the statutory language is plain this "is also where the inquiry should end." United States v. Ron Pair Enterprises, Inc., --- U.S. ----, 109 S.Ct. 1026, 1030 (1989). Absent a clearly expressed legislative intent to the contrary, unambiguous language in a statute is conclusive. Bradley v. Austin, 841 F.2d 1288, 1293 (6th Cir.1988). Moreover, the Supreme Court has stated that "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979).
 
 
 17
 The Act defines "owner or operator" in the case of an onshore facility as "any person owning or operating such onshore facility ..." 33 U.S.C. Sec. 1321(a)(6). This is not an extremely helpful definition, but, as Judge Easterbrook wrote in Edward Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 156 (7th Cir.1988), concerning a similar definition in a different statute, the very circularity of the definition "strongly implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings." In Webster's Third International Dictionary, Unabridged (1971 ed.) the first definition of "operator" is--
 
 
 18
 One that produces a physical effect or engages himself in the mechanical aspect of any process or activity ... broadly, one that uses or operates a machine professionally or otherwise.
 
 
 19
 In the present case, a Carr employee was operating the drilling rig deepening the well when an oil flow came from the well bore. This oil eventually came to the surface and flowed into navigable waters of the United States. Certainly, applying Webster's definition, Carr would be an "operator" liable for the cost of cleanup under Sec. 1321(f).
 
 B.
 
 20
 As we have noted, Carr contends that where the owner is present and in control of the operation, the person doing the work is an employee of the owner, not an operator. Carr relies principally upon Union Petroleum Corp. v. United States, 651 F.2d 734 (Ct.Cl.1981).
 
 
 21
 There were two issues in Union Petroleum: (1) whether an oil discharge occurred from a facility owned or operated by the plaintiff; and (2) whether the discharge occurred solely as the result of acts of third parties. The discharge occurred when vandals damaged two oil-filled railroad tank cars. Some of the oil flowed into navigable waters. Union notified the Coast Guard immediately upon discovering the spill and began a cleanup. After completion of the work, Union sued to recover its cleanup expenditures as provided in 33 U.S.C. Sec. 1321(i)(1). Id. at 739-42.
 
 
 22
 At the time of the spill, one of the tank cars from which the discharge occurred was on a loading rack on Union's property, while the other tank car had been moved a few feet away from Union's oil terminal to a parallel spur on land owned by B & M Railroad. The court found that Union's terminal and the two tank cars comprised the onshore facility from which the oil was discharged. Id. at 743.
 
 
 23
 The court also found that Union was the owner and operator of the onshore facility. In dictum, the court stated that even if the tank cars were considered the facility from which the discharge occurred, Union would still be the operator. Union employees loaded the tank cars, and storage of the cars was under Union's direction and control. "Union was operationally responsible for the tank cars until they were linked together and sent down the tracks to the utility using the oil.... The question is one of operational control." Id. at 744-45.
 
 
 24
 We decline to adopt the narrow "operational control" construction of "operator" as set forth in Union Petroleum because such a construction would be contrary to the intent of Congress that "there should be no discharges of oil ... into or upon the navigable waters of the United States." 33 U.S.C. Sec. 1221(b)(1). Congress sought to achieve this goal by making broad classes of persons identified as "owner or operator" liable for the costs when such discharges occur. One made liable for the costs can reasonably be expected to take the precautions necessary to prevent discharges. Section 1321(f)(2) is a remedial provision that creates strict liability for the discharge of oil into our nation's navigable waters. As such, it must be liberally construed to achieve its purposes. See Sabine Towing & Transportation Co. v. United States, 666 F.2d 561, 565-66 (Ct.Cl.1981).
 
 
 25
 Since the ordinary meaning of "operator" is consistent with the purpose of Congress to prevent discharges of oil into our navigable waters, we construe the term accordingly. See Mills Music, Inc. v. Snyder, 469 U.S. 153, 164 (1985).
 
 CONCLUSION
 
 26
 Congress used the word "operator" in Sec. 1321 in its ordinary sense. Carr was performing the task of deepening an oil well, with its employee operating its drilling rig. Under the generally accepted meaning of the word, Carr was the "operator" at the time of the oil spill.
 
 
 27
 The judgment of the district court is affirmed.