## UNITED STATES *v.* BESTFOODS ET AL.

No. 97–454.   Argued March 24, 1998—Decided June 8, 1998

52

SOUTER, J., delivered the opinion for a unanimous Court.

*Assistant Attorney General Schiffer* argued the cause for the United States. With her on the briefs were *Solicitor General Waxman, Deputy Solicitor General Wallace, Jeffrey P. Minear, Martin W. Matzen, Michael J. McNulty,* and *Evelyn S. Ying. Frank J. Kelley,* Attorney General of Michigan, *Thomas L. Casey,* Solicitor General, and *Kathleen L. Cavanaugh* and *Robert P. Reichel,* Assistant Attorneys General, filed a brief for the Michigan Department of Environmental Quality, respondent under this Court's Rule 12.6, urging reversal.

*Kenneth S. Geller* argued the cause for respondents. With him on the briefs for respondent Bestfoods were *Donald M. Falk* and *J. Michael Smith. John D. Tully, John V. Byl,* and *Robert J. Jonker* filed briefs for respondents Aerojet-General Corp. et al.*

---

*A brief of *amici curiae* urging reversal was filed for the State of Minnesota et al. by *Hubert H. Humphrey III,* Attorney General of Minnesota, and *Jocelyn F. Olson, Paschal O. Nwokocha,* and *Alan C. Williams,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Winston Bryant* of Arkansas, *Richard Blumenthal* of Connecticut, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Drew Ketterer* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Peter Verniero* of New Jersey, *Tom Udall* of New Mexico, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Hardy Myers* of Oregon, *Jeffrey B. Pine* of Rhode Island, *John Knox Walkup* of Tennessee, *Dan Morales* of Texas, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, *Darrell V. McGraw* of West Virginia, *James E. Doyle* of Wisconsin, and *William U. Hill* of Wyoming.

Briefs of *amici curiae* urging affirmance were filed for the Atlantic Legal Foundation by *Martin S. Kaufman* and *Douglas Foster;* for the American Forest & Paper Association et al. by *Donald B. Mitchell, Jr.,* and *John C. Chambers;* for Atlantic Richfield Co. et al. by *Michael J. Gallagher, Andrew M. Low,* and *Karl M. Tilleman;* for the National Association of Manufacturers et al. by *Bruce J. Ennis, Jr., Paul M. Smith, Ann M. Kappler, Jan S. Amundson, Quentin Riegel, Robin S. Conrad,* and

JUSTICE SOUTER delivered the opinion of the Court.

The United States brought this action for the costs of cleaning up industrial waste generated by a chemical plant. The issue before us, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 94 Stat. 2767, as amended, 42 U. S. C. § 9601 *et seq.*, is whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary. We answer no, unless the corporate veil may be pierced. But a corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility.

## I

In 1980, CERCLA was enacted in response to the serious environmental and health risks posed by industrial pollution. See *Exxon Corp.* v. *Hunt*, 475 U. S. 355, 358–359 (1986). "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp.* v. *United States*, 511 U. S. 809, 814 (1994). If it satisfies certain statutory conditions, the United States may, for instance, use the "Hazardous Substance Superfund" to finance cleanup efforts, see 42 U. S. C. §§ 9601(11), 9604; 26 U. S. C. § 9507, which it may then replenish by suits brought under § 107 of the Act against, among others, "any person who at the time of disposal of any hazardous substance owned or operated any facility." 42 U. S. C. § 9607(a)(2). So, those actually "responsible for any damage, environmental harm, or injury from chemical poi-

*Robert L. Graham;* for the United States Business & Industrial Council by *David G. Palmer;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Paul D. Kamenar,* and *Thomas R. Mounteer.*

sons [may be tagged with] the cost of their actions," S. Rep. No. 96–848, p. 13 (1980).[1] The term "person" is defined in CERCLA to include corporations and other business organizations, see 42 U. S. C. § 9601(21), and the term "facility" enjoys a broad and detailed definition as well, see § 9601(9).[2] The phrase "owner or operator" is defined only by tautology, however, as "any person owning or operating" a facility, § 9601(20)(A)(ii), and it is this bit of circularity that prompts our review. Cf. *Exxon Corp.* v. *Hunt, supra,* at 363 (CERCLA, "unfortunately, is not a model of legislative draftsmanship").

## II

In 1957, Ott Chemical Co. (Ott I) began manufacturing chemicals at a plant near Muskegon, Michigan, and its intentional and unintentional dumping of hazardous substances significantly polluted the soil and ground water at the site. In 1965, respondent CPC International Inc.[3] incorporated a wholly owned subsidiary to buy Ott I's assets in exchange for CPC stock. The new company, also dubbed Ott Chemical Co. (Ott II), continued chemical manufacturing at the site, and continued to pollute its surroundings. CPC kept the

---

[1] "CERCLA . . . imposes the costs of the cleanup on those responsible for the contamination." *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1, 7 (1989). "The remedy that Congress felt it needed in CERCLA is sweeping: *everyone* who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup." *Id.,* at 21 (plurality opinion of Brennan, J.).

[2] "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel."

[3] CPC has recently changed its name to Bestfoods. Consistently with the briefs and the opinions below, we use the name CPC herein.

managers of Ott I, including its founder, president, and principal shareholder, Arnold Ott, on board as officers of Ott II. Arnold Ott and several other Ott II officers and directors were also given positions at CPC, and they performed duties for both corporations.

In 1972, CPC sold Ott II to Story Chemical Company, which operated the Muskegon plant until its bankruptcy in 1977. Shortly thereafter, when respondent Michigan Department of Natural Resources (MDNR)[4] examined the site for environmental damage, it found the land littered with thousands of leaking and even exploding drums of waste, and the soil and water saturated with noxious chemicals. MDNR sought a buyer for the property who would be willing to contribute toward its cleanup, and after extensive negotiations, respondent Aerojet-General Corp. arranged for transfer of the site from the Story bankruptcy trustee in 1977. Aerojet created a wholly owned California subsidiary, Cordova Chemical Company (Cordova/California), to purchase the property, and Cordova/California in turn created a wholly owned Michigan subsidiary, Cordova Chemical Company of Michigan (Cordova/Michigan), which manufactured chemicals at the site until 1986.[5]

By 1981, the federal Environmental Protection Agency had undertaken to see the site cleaned up, and its long-term remedial plan called for expenditures well into the tens of millions of dollars. To recover some of that money, the

---

[4] The powers and responsibilities of MDNR have since been transferred to the Michigan Department of Environmental Quality.

[5] Cordova/California and MDNR entered into a contract under which Cordova/California agreed to undertake certain cleanup actions, and MDNR agreed to share in the funding of those actions and to indemnify Cordova/California for various expenses. The Michigan Court of Appeals has held that this agreement requires MDNR to indemnify Aerojet and its Cordova subsidiaries for any CERCLA liability that they may incur in connection with their activities at the Muskegon facility. See *Cordova Chemical Co.* v. *MDNR*, 212 Mich. App. 144, 536 N. W. 2d 860 (1995), leave to appeal denied, 453 Mich. 901, 554 N. W. 2d 319 (1996).

58

United States filed this action under § 107 in 1989, naming five defendants as responsible parties: CPC, Aerojet, Cordova/California, Cordova/Michigan, and Arnold Ott.[6] (By that time, Ott I and Ott II were defunct.) After the parties (and MDNR) had launched a flurry of contribution claims, counterclaims, and cross-claims, the District Court consolidated the cases for trial in three phases: liability, remedy, and insurance coverage. So far, only the first phase has been completed; in 1991, the District Court held a 15-day bench trial on the issue of liability. Because the parties stipulated that the Muskegon plant was a "facility" within the meaning of 42 U. S. C. § 9601(9), that hazardous substances had been released at the facility, and that the United States had incurred reimbursable response costs to clean up the site, the trial focused on the issues of whether CPC and Aerojet, as the parent corporations of Ott II and the Cordova companies, had "owned or operated" the facility within the meaning of § 107(a)(2).

The District Court said that operator liability may attach to a parent corporation both directly, when the parent itself operates the facility, and indirectly, when the corporate veil can be pierced under state law. See *CPC Int'l, Inc.* v. *Aerojet-General Corp.*, 777 F. Supp. 549, 572 (WD Mich. 1991). The court explained that, while CERCLA imposes direct liability in situations in which the corporate veil cannot be pierced under traditional concepts of corporate law, "the statute and its legislative history do not suggest that CERCLA rejects entirely the crucial limits to liability that are inherent to corporate law." *Id.*, at 573. As the District Court put it:

> "a parent corporation is directly liable under section 107(a)(2) as an operator only when it has exerted power or influence over its subsidiary by actively participating in and exercising control over the subsidiary's business

---

[6] Arnold Ott settled out of court with the Government on the eve of trial.

during a period of disposal of hazardous waste. A parent's actual participation in and control over a subsidiary's functions and decision-making creates 'operator' liability under CERCLA; a parent's mere oversight of a subsidiary's business in a manner appropriate and consistent with the investment relationship between a parent and its wholly owned subsidiary does not." *Ibid.*

Applying that test to the facts of this case, the District Court held both CPC and Aerojet liable under § 107(a)(2) as operators. As to CPC, the court found it particularly telling that CPC selected Ott II's board of directors and populated its executive ranks with CPC officials, and that a CPC official, G. R. D. Williams, played a significant role in shaping Ott II's environmental compliance policy.

After a divided panel of the Court of Appeals for the Sixth Circuit reversed in part, *United States* v. *Cordova/Michigan*, 59 F. 3d 584, that court granted rehearing en banc and vacated the panel decision, 67 F. 3d 586 (1995). This time, 7 judges to 6, the court again reversed the District Court in part. 113 F. 3d 572 (1997). The majority remarked on the possibility that a parent company might be held directly liable as an operator of a facility owned by its subsidiary: "At least conceivably, a parent might independently operate the facility in the stead of its subsidiary; or, as a sort of joint venturer, actually operate the facility alongside its subsidiary." *Id.*, at 579. But the court refused to go any further and rejected the District Court's analysis with the explanation:

"[W]here a parent corporation is sought to be held liable as an operator pursuant to 42 U. S. C. § 9607(a)(2) based upon the extent of its control of its subsidiary which owns the facility, the parent will be liable only when the requirements necessary to pierce the corporate veil [under state law] are met. In other words, . . . whether the parent will be liable as an operator depends

upon whether the degree to which it controls its subsidiary and the extent and manner of its involvement with the facility, amount to the abuse of the corporate form that will warrant piercing the corporate veil and disregarding the separate corporate entities of the parent and subsidiary." *Id.,* at 580.

Applying Michigan veil-piercing law, the Court of Appeals decided that neither CPC nor Aerojet[7] was liable for controlling the actions of its subsidiaries, since the parent and subsidiary corporations maintained separate personalities and the parents did not utilize the subsidiary corporate form to perpetrate fraud or subvert justice.

We granted certiorari, 522 U. S. 1024 (1997), to resolve a conflict among the Circuits over the extent to which parent corporations may be held liable under CERCLA for operating facilities ostensibly under the control of their subsidiaries.[8] We now vacate and remand.

_____

[7] Unlike CPC, Aerojet does not base its defense in this Court on a claim that, absent unusual circumstances, a parent company can be held liable as an operator of a facility only by piercing the corporate veil. Rather, Aerojet denies liability by claiming that (1) neither it nor its subsidiaries disposed of hazardous substances during their operation of the facility, see Brief for Respondents Aerojet-General Corp. et al. 27–36, and (2) it is entitled to a third-party defense under § 107(b)(3) of CERCLA, 42 U. S. C. § 9607(b)(3), see Brief for Respondents Aerojet-General Corp. et al. 38–46. The Court of Appeals expressed some measure of agreement with Aerojet on these points and instructed the District Court to consider them on remand. See 113 F. 3d, at 577, 583. These issues are not before this Court.

[8] Compare *United States* v. *Cordova/Michigan,* 113 F. 3d 572, 580 (CA6 1997) (case below) (parent may be held liable for controlling affairs of subsidiary only when the corporate veil can be pierced), and *Joslyn Mfg. Co.* v. *T. L. James & Co.,* 893 F. 2d 80, 82–83 (CA5 1990) (same), cert. denied, 498 U. S. 1108 (1991) (but cf. *Riverside Market Dev. Corp.* v. *International Bldg. Prods., Inc.,* 931 F. 2d 327, 330 (CA5) (parent companies that actually participate in the wrongful conduct cannot hide behind the corporate veil, and can be held directly liable without veil piercing), cert. denied, 502 U. S. 1004 (1991)), with *United States* v. *Kayser-Roth Corp.,* 910 F. 2d 24, 27

## III

It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L. J. 193 (1929) (hereinafter Douglas); see also, *e. g., Buechner* v. *Farbenfabriken Bayer Aktiengesellschaft*, 38 Del. Ch. 490, 494, 154 A. 2d 684, 687 (1959); *Berkey* v. *Third Ave. R. Co.*, 244 N. Y. 84, 85, 155 N. E. 58 (1926) (Cardozo, J.); 1 W. Fletcher, Cyclopedia of Law of Private Corporations § 33, p. 568 (rev. ed. 1990) ("Neither does the mere fact that there exists a parent-subsidiary relationship between two corporations make the one liable for the torts of its affiliate"); Horton, Liability of Corporation for Torts of Subsidiary, 7 A. L. R. 3d 1343, 1349 (1966) ("Ordinarily, a corporation which chooses to facilitate the operation of its business by employment of another corporation as a subsidiary will not be penalized by a judicial determination of liability for the legal obligations of the subsidiary"); cf. *Anderson* v. *Abbott*, 321 U. S. 349, 362 (1944) ("Limited liability is the rule, not the exception"); *Burnet* v. *Clark*, 287 U. S. 410, 415 (1932) ("A corporation and its stockholders are generally to be treated as separate entities"). Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability

(CA1 1990) (parent actively involved in the affairs of its subsidiary may be held directly liable as an operator of the facility, regardless of whether the corporate veil can be pierced), cert. denied, 498 U. S. 1084 (1991), *Schiavone* v. *Pearce*, 79 F. 3d 248, 254–255 (CA2 1996) (same), *Lansford-Coaldale Joint Water Auth.* v. *Tonolli Corp.*, 4 F. 3d 1209, 1220–1225 (CA3 1993) (same), *Jacksonville Elec. Auth.* v. *Bernuth Corp.*, 996 F. 2d 1107, 1110 (CA11 1993) (same), and *Nurad, Inc.* v. *William E. Hooper & Sons Co.*, 966 F. 2d 837, 842 (CA4) (parent having authority to control subsidiary is liable as an operator, even if it did not exercise that authority), cert. denied, 506 U. S. 940 (1992).

beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." Douglas 196 (footnotes omitted). Although this respect for corporate distinctions when the subsidiary is a polluter has been severely criticized in the literature, see, *e. g.*, Note, Liability of Parent Corporations for Hazardous Waste Cleanup and Damages, 99 Harv. L. Rev. 986 (1986), nothing in CERCLA purports to reject this bedrock principle, and against this venerable common-law backdrop, the congressional silence is audible. Cf. *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256, 266–267 (1979) ("[S]ilence is most eloquent, for such reticence while contemplating an important and controversial change in existing law is unlikely"). The Government has indeed made no claim that a corporate parent is liable as an owner or an operator under § 107 simply because its subsidiary is subject to liability for owning or operating a polluting facility.

But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, *inter alia*, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf. See, *e. g.*, *Anderson* v. *Abbott*, *supra*, at 362 ("[T]here are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied"); *Chicago, M. & St. P. R. Co.* v. *Minneapolis Civic and Commerce Assn.*, 247 U. S. 490, 501 (1918) (principles of corporate separateness "have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose . . . of controlling a subsidiary company so

that it may be used as a mere agency or instrumentality of the owning company"); P. Blumberg, Law of Corporate Groups: Tort, Contract, and Other Common Law Problems in the Substantive Law of Parent and Subsidiary Corporations §§ 6.01–6.06 (1987 and 1996 Supp.) (discussing the law of veil piercing in the parent-subsidiary context). Nothing in CERCLA purports to rewrite this well-settled rule, either. CERCLA is thus like many another congressional enactment in giving no indication that "the entire corpus of state corporation law is to be replaced simply because a plaintiff's cause of action is based upon a federal statute," *Burks* v. *Lasker*, 441 U. S. 471, 478 (1979), and the failure of the statute to speak to a matter as fundamental as the liability implications of corporate ownership demands application of the rule that "[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law," *United States* v. *Texas*, 507 U. S. 529, 534 (1993) (internal quotation marks omitted). The Court of Appeals was accordingly correct in holding that when (but only when) the corporate veil may be pierced,[9] may a parent corporation

---

[9] There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing. Compare, *e. g.*, 113 F. 3d, at 584–585 (Merritt, J., concurring in part and dissenting in part) (arguing that federal common law should apply), *Lansford-Coaldale Joint Water Auth.* v. *Tonolli Corp.*, 4 F. 3d, at 1225 ("[G]iven the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs when corporate veil-piercing is justified under CERCLA"), and Aronovsky & Fuller, Liability of Parent Corporations for Hazardous Substance Releases under CERCLA, 24 U. S. F. L. Rev. 421, 455 (1990) ("CERCLA enforcement should not be hampered by subordination of its goals to varying state law rules of alter ego theory"), with, *e. g.*, 113 F. 3d, at 580 ("Whether the circumstances in this case warrant a piercing of the corporate veil will be determined by state law"), and Dennis, Liability of Officers, Directors and Stockholders under CERCLA: The Case for Adopting State Law, 36 Vill. L. Rev. 1367 (1991) (arguing that state law should apply). Cf. *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 33

be charged with derivative CERCLA liability for its subsidiary's actions.[10]

## IV

### A

If the Act rested liability entirely on ownership of a polluting facility, this opinion might end here; but CERCLA liability may turn on operation as well as ownership, and nothing in the statute's terms bars a parent corporation from direct liability for its own actions in operating a facility owned by its subsidiary. As Justice (then-Professor) Douglas noted almost 70 years ago, derivative liability cases are to be distinguished from those in which "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management" and "the parent is directly a participant in the wrong complained of." Douglas 207, 208.[11]

(Mass. 1987) (noting that, since "federal common law draws upon state law for guidance, . . . the choice between state and federal [veil-piercing law] may in many cases present questions of academic interest, but little practical significance"). But cf. Note, Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L. Rev. 853 (1982) (arguing that federal common law need not mirror state law, because "federal common law should look to federal statutory policy rather than to state corporate law when deciding whether to pierce the corporate veil"). Since none of the parties challenges the Sixth Circuit's holding that CPC and Aerojet incurred no derivative liability, the question is not presented in this case, and we do not address it further.

[10] Some courts and commentators have suggested that this indirect, veil-piercing approach can subject a parent corporation to liability only as an owner, and not as an operator. See, e. g., Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., supra, at 1220; Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U. L. Q. 223, 281–282 (1994) (hereinafter Oswald). We think it is otherwise, however. If a subsidiary that operates, but does not own, a facility is so pervasively controlled by its parent for a sufficiently improper purpose to warrant veil piercing, the parent may be held derivatively liable for the subsidiary's acts as an operator.

[11] While this article was written together with Professor Shanks, the passages quoted in this opinion were written solely by Justice Douglas. See Douglas 193, n. *.

In such instances, the parent is directly liable for its own actions. See H. Henn & J. Alexander, Laws of Corporations 347 (3d ed. 1983) (hereinafter Henn & Alexander) ("Apart from corporation law principles, a shareholder, whether a natural person or a corporation, may be liable on the ground that such shareholder's activity resulted in the liability"). The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that the parent "corporation is [itself] responsible for the wrongs committed by its agents in the course of its business," *Mine Workers v. Coronado Coal Co.*, 259 U. S. 344, 395 (1922), and whereas the rules of veil piercing limit derivative liability for the actions of another corporation, CERCLA's "operator" provision is concerned primarily with direct liability for one's own actions. See, *e. g., Sidney S. Arst Co.* v. *Pipefitters Welfare Ed. Fund,* 25 F. 3d 417, 420 (CA7 1994) ("[T]he direct, personal liability provided by CERCLA is distinct from the derivative liability that results from piercing the corporate veil" (internal quotation marks omitted)). It is this direct liability that is properly seen as being at issue here.

Under the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. See 42 U. S. C. § 9607(a)(2). This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice. If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability. See *Riverside Market Dev. Corp.* v. *International Bldg. Prods., Inc.,* 931 F. 2d 327, 330 (CA5) ("CERCLA prevents individuals from hiding behind the corporate shield when, as 'operators,' they themselves actually participate in the wrongful conduct prohibited by the Act"),

66 .

cert. denied, 502 U. S. 1004 (1991); *United States* v. *Kayser-Roth Corp.*, 910 F. 2d 24, 26 (CA1 1990) ("[A] person who is an operator of a facility is not protected from liability by the legal structure of ownership").[12]

This much is easy to say: the difficulty comes in defining actions sufficient to constitute direct parental "operation." Here of course we may again rue the uselessness of CERCLA's definition of a facility's "operator" as "any person . . . operating" the facility, 42 U. S. C. § 9601(20)(A)(ii), which leaves us to do the best we can to give the term its "ordinary or natural meaning." *Bailey* v. *United States*, 516 U. S. 137, 145 (1995) (internal quotation marks omitted). In a mechanical sense, to "operate" ordinarily means "[t]o control the functioning of; run: *operate a sewing machine.*" American Heritage Dictionary 1268 (3d ed. 1992); see also Webster's New International Dictionary 1707 (2d ed. 1958) ("to work; as, to *operate* a machine"). And in the organizational sense more obviously intended by CERCLA, the word ordinarily means "[t]o conduct the affairs of; manage: *operate a business.*" American Heritage Dictionary, *supra,* at 1268; see also Webster's New International Dictionary, *supra,* at 1707 ("to manage"). So, under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having

---

[12] See Oswald 257 ("There are . . . instances . . . in which the parent has not sufficiently overstepped the bounds of corporate separateness to warrant piercing, yet is involved enough in the facility's activities that it should be held liable as an operator. Imagine, for example, a parent who strictly observed corporate formalities, avoided intertwining officers and directors, and adequately capitalized its subsidiary, yet provided active, daily supervision and control over hazardous waste disposal activities of the subsidiary. Such a parent should not escape liability just because its activities do not justify a piercing of the subsidiary's veil").

to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

## B

With this understanding, we are satisfied that the Court of Appeals correctly rejected the District Court's analysis of direct liability. But we also think that the appeals court erred in limiting direct liability under the statute to a parent's sole or joint venture operation, so as to eliminate any possible finding that CPC is liable as an operator on the facts of this case.

## 1

By emphasizing that "CPC is directly liable under section 107(a)(2) as an operator because CPC actively participated in and exerted significant control over Ott II's business and decision-making," 777 F. Supp., at 574, the District Court applied the "actual control" test of whether the parent "actually operated the business of its subsidiary," *id.*, at 573, as several Circuits have employed it, see, *e. g., United States* v. *Kayser-Roth Corp., supra,* at 27 (operator liability "requires active involvement in the affairs of the subsidiary"); *Jacksonville Elec. Auth.* v. *Bernuth Corp.,* 996 F. 2d 1107, 1110 (CA11 1993) (parent is liable if it "actually exercised control over, or was otherwise intimately involved in the operations of, the [subsidiary] corporation immediately responsible for the operation of the facility" (internal quotation marks omitted)).

The well-taken objection to the actual control test, however, is its fusion of direct and indirect liability; the test is administered by asking a question about the relationship between the two corporations (an issue going to indirect liability) instead of a question about the parent's interaction with the subsidiary's facility (the source of any direct liability). If, however, direct liability for the parent's operation of the facility is to be kept distinct from derivative liability for the subsidiary's own operation, the focus of the enquiry must

68

necessarily be different under the two tests. "The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language." Oswald 269; see also *Schiavone* v. *Pearce,* 79 F. 3d 248, 254 (CA2 1996) ("Any liabilities [the parent] may have as an *operator,* then, stem directly from its control over the plant"). The District Court was therefore mistaken to rest its analysis on CPC's relationship with Ott II, premising liability on little more than "CPC's 100-percent ownership of Ott II" and "CPC's active participation in, and at times majority control over, Ott II's board of directors." 777 F. Supp., at 575. The analysis should instead have rested on the relationship between CPC and the Muskegon facility itself.

In addition to (and perhaps as a reflection of) the erroneous focus on the relationship between CPC and Ott II, even those findings of the District Court that might be taken to speak to the extent of CPC's activity at the facility itself are flawed, for the District Court wrongly assumed that the actions of the joint officers and directors are necessarily attributable to CPC. The District Court emphasized the facts that CPC placed its own high-level officials on Ott II's board of directors and in key management positions at Ott II, and that those individuals made major policy decisions and conducted day-to-day operations at the facility: "Although Ott II corporate officers set the day-to-day operating policies for the company without any need to obtain formal approval from CPC, CPC actively participated in this decision-making because high-ranking CPC officers served in Ott II management positions." *Id.,* at 559; see also *id.,* at 575 (relying on "CPC's involvement in major decision-making and day-to-day operations through CPC officials who served within Ott II management, including the positions of president and chief

executive officer," and on "the conduct of CPC officials with respect to Ott II affairs, particularly Arnold Ott"); *id.*, at 558 ("CPC actively participated in, and at times controlled, the policy-making decisions of its subsidiary through its representation on the Ott II board of directors"); *id.*, at 559 ("CPC also actively participated in and exerted control over day-to-day decision-making at Ott II through representation in the highest levels of the subsidiary's management").

In imposing direct liability on these grounds, the District Court failed to recognize that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *American Protein Corp.* v. *AB Volvo*, 844 F. 2d 56, 57 (CA2), cert. denied, 488 U. S. 852 (1988); see also *Kingston Dry Dock Co.* v. *Lake Champlain Transp. Co.*, 31 F. 2d 265, 267 (CA2 1929) (L. Hand, J.) ("Control through the ownership of shares does not fuse the corporations, even when the directors are common to each"); Henn & Alexander 355 (noting that it is "normal" for a parent and subsidiary to "have identical directors and officers").

This recognition that the corporate personalities remain distinct has its corollary in the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Lusk* v. *Foxmeyer Health Corp.*, 129 F. 3d 773, 779 (CA5 1997); see also *Fisser* v. *International Bank*, 282 F. 2d 231, 238 (CA2 1960). Since courts generally presume "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," P. Blumberg, Law of Corporate Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations § 1.02.1, p. 12 (1983); see, *e. g.*, *United States* v. *Jon-T Chemicals, Inc.*, 768 F. 2d 686, 691 (CA5 1985), cert. denied, 475 U. S. 1014 (1986), it cannot be enough to establish liability

here that dual officers and directors made policy decisions and supervised activities at the facility. The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and directors, when they committed those acts.[13] The District Court made no such enquiry here, however, disregarding entirely this time-honored common-law rule.

In sum, the District Court's focus on the relationship between parent and subsidiary (rather than parent and facility), combined with its automatic attribution of the actions of dual officers and directors to the corporate parent, erroneously, even if unintentionally, treated CERCLA as though it displaced or fundamentally altered common-law standards of limited liability. Indeed, if the evidence of common corporate personnel acting at management and directorial levels were enough to support a finding of a parent corporation's direct operator liability under CERCLA, then the possibility of resort to veil piercing to establish indirect, derivative liability for the subsidiary's violations would be academic. There would in essence be a relaxed, CERCLA-specific rule of derivative liability that would banish traditional standards and expectations from the law of CERCLA liability. But, as we have said, such a rule does not arise from congressional silence, and CERCLA's silence is dispositive.

### 2

We accordingly agree with the Court of Appeals that a participation-and-control test looking to the parent's supervi-

---

[13] We do not attempt to recite the ways in which the Government could show that dual officers or directors were in fact acting on behalf of the parent. Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

sion over the subsidiary, especially one that assumes that dual officers always act on behalf of the parent, cannot be used to identify operation of a facility resulting in direct parental liability. Nonetheless, a return to the ordinary meaning of the word "operate" in the organizational sense will indicate why we think that the Sixth Circuit stopped short when it confined its examples of direct parental operation to exclusive or joint ventures, and declined to find at least the possibility of direct operation by CPC in this case.

In our enquiry into the meaning Congress presumably had in mind when it used the verb "to operate," we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate "operation" as including the exercise of direction over the facility's activities. See *supra*, at 66–67. The Court of Appeals recognized this by indicating that a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture. See 113 F. 3d, at 579. We anticipated a further possibility above, however, when we observed that a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility. See n. 13, *supra*. Yet another possibility, suggested by the facts of this case, is that an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.

Identifying such an occurrence calls for line-drawing yet again, since the acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points. Just as we may look to such norms in identifying the limits of the presumption that a dual office-

holder acts in his ostensible capacity, so here we may refer to them in distinguishing a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." Oswald 282. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

There is, in fact, some evidence that CPC engaged in just this type and degree of activity at the Muskegon plant. The District Court's opinion speaks of an agent of CPC alone who played a conspicuous part in dealing with the toxic risks emanating from the operation of the plant. G. R. D. Williams worked only for CPC; he was not an employee, officer, or director of Ott II, see Tr. of Oral Arg. 7, and thus, his actions were of necessity taken only on behalf of CPC. The District Court found that "CPC became directly involved in environmental and regulatory matters through the work of . . . Williams, CPC's governmental and environmental affairs director. Williams . . . became heavily involved in environmental issues at Ott II." 777 F. Supp., at 561. He "actively participated in and exerted control over a variety of Ott II environmental matters," *ibid.*, and he "issued directives regarding Ott II's responses to regulatory inquiries," *id.*, at 575.

We think that these findings are enough to raise an issue of CPC's operation of the facility through Williams's actions, though we would draw no ultimate conclusion from these findings at this point. Not only would we be deciding in the first instance an issue on which the trial and appellate courts did not focus, but the very fact that the District Court did not see the case as we do suggests that there may be still

more to be known about Williams's activities. Indeed, even as the factual findings stand, the trial court offered little in the way of concrete detail for its conclusions about Williams's role in Ott II's environmental affairs, and the parties vigorously dispute the extent of Williams's involvement. Prudence thus counsels us to remand, on the theory of direct operation set out here, for reevaluation of Williams's role, and of the role of any other CPC agent who might be said to have had a part in operating the Muskegon facility.[14]

## V

The judgment of the Court of Appeals for the Sixth Circuit is vacated, and the case is remanded with instructions to return it to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

---

[14] There are some passages in the District Court's opinion that might suggest that, without reference to Williams, some of Ott II's actions in operating the facility were in fact dictated by, and thus taken on behalf of, CPC. See, *e. g.*, 777 F. Supp., at 561 ("CPC officials engaged in . . . missions to Ott II in which Ott II officials received instructions on how to improve and change"); *id.*, at 559 ("CPC executives who were not Ott II board members also occasionally attended Ott II board meetings"). But nothing in the District Court's findings of fact, as written, even comes close to overcoming the presumption that Ott II officials made their decisions and performed their acts as agents of Ott II. Indeed, the finding that "Ott II corporate officers set the day-to-day operating policies for the company without any need to obtain formal approval from CPC," *ibid.*, indicates just the opposite. Still, the Government is, of course, free on remand to point to any additional evidence, not cited by the District Court, that would tend to establish that Ott II's decisionmakers acted on specific orders from CPC.