UNITED STATES of America, Plaintiff,

v.

QWEST CORPORATION, and Utility Resources, Inc. Defendants.

No. CIV. 04–3540MJDFLN.

United States District Court, D. Minnesota.

Jan. 24, 2005.

Joan D. Humes, Assistant United States Attorney, Minneapolis, MN, Counsel for Plaintiff.

William P. Hefner and Stacy Lynn Bettison, Greene Espel, P.L.L.P., and Christopher J. Sutton, Perkins Coie, L.L.P., Counsel for Defendant Qwest Corporation.

John E. Drawz, Matthew T. Boos, and Theresa M. Weber, Fredrikson & Byron, P.A., Minneapolis, MN, Counsel for Defendant Utility Resources, Inc.

## MEMORANDUM OF LAW & ORDER

DAVIS, District Judge.

## I. INTRODUCTION

This matter is before the Court on Defendant Qwest Corporation's Motion to Dismiss. In the underlying action, Plaintiff United States of America has sued Defendant Qwest Corporation and Defendant Utility Resources, Inc. ("URI") for recovery costs incurred in connection with the releases of hazardous substances pursuant to § 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9607, as amended by the Superfund Amendments and Reauthorization Act of 1986, 100 Stat. 1613 (1986) ("CERCLA"). The Court heard oral arguments on December 3, 2004. For the reasons that follow, the Court grants Qwest's Motion to Dismiss.

## II. FACTUAL BACKGROUND

The United States brought this action on behalf of the Environmental Protection Agency to recover response costs the government incurred at the MacGillis and Gibbs/Bell Lumber & Pole Superfund Site, New Brighton, Ramsey County, Minnesota ("MacGillis Site"). The case involves work performed by Defendants to install new utility transmission lines in a public right-of-way located adjacent to the MacGillis Site.

The EPA determined in 1984 that hazardous substances within the meaning of § 101(14) of CERCLA, 42 U.S.C. § 9601(14), including wood treatment process wastewater, process sludge, preservative drippage, and spent formulations from wood treating processes using chlorophenolic process compounds, creosote, chronium and arsenic, were disposed of at the Site by former owners and operators. The MacGillis Site was listed on the National Priorities List in 1984 under § 105(a) of CERCLA and 40 C.F.R. Part 300, the National Contingency Plan. The EPA constructed a remedy, which included wells for the extraction of contaminated groundwater, transport of the contaminated groundwater through a series of underground forcemains, consisting of buried piping, and treatment of the groundwater with an on-site biological treatment unit.

Qwest's relationship to the MacGillis Site began in October 2000 when it arranged for a utility contractor, Communicor Corporation, to install an underground communication line in a public right-of-way adjacent to the MacGillis Site. Communicor hired a subcontractor, Defendant URI, to install the communications line. URI contacted the Minnesota "One Call Center" prior to installing the line to locate all underground utilities in the right-of-way where the communication line was to be installed. When the EPA initially constructed its underground water lines, it failed to install tracers so the lines could be detected from the surface. The EPA also failed to register the underground water lines with the "One Call Center"

utility locate program, as required by state law. Minn.Stat. § 216D (2002).

In or about October 2000, the forcemains at the MacGillis Site constructed by the EPA were ruptured during Defendants' drilling activities for the installation of the underground communication line. The forcemains were constructed in the right-of-way to transport contaminated groundwater from collection points off the MacGillis Site to the water treatment plant on the Site. The rupture of the forcemains resulted in the release or threatened release of hazardous substances from the untreated groundwater back into the environment.

To respond to these releases or threatened releases of hazardous substances, the EPA incurred Superfund response costs. The government incurred approximately $130,030 in costs to repair the ruptured underground lines. Qwest asserts, however, that the total cost incurred by the government to respond to the hazardous substances at the MacGillis Site is over $31 million.

The Amended Complaint alleges that Defendants are liable as operators under § 107 of CERCLA. Qwest filed a Motion to Dismiss on the grounds that it does not meet the definition of an "operator" under CERCLA.

## III. DISCUSSION

### 1. Standard for Dismissal Under Rule 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a claim for failure to state a claim upon which relief can be granted. When considering a motion to dismiss, the pleadings must be construed in the light most favorable to the nonmoving party and the facts alleged in the complaint must be viewed as true. *Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir.1994). Ambiguities concerning the sufficiency of the claim should be resolved in favor of the nonmoving party. *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995).

"Dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and destined to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir.2001) (citations omitted). A cause of action "should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Schaller Telephone Co. v. Golden Sky Systems, Inc.*, 298 F.3d 736, 740 (8th Cir.2002) (citations omitted). "[D]ismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003) (citations omitted).

### 2. CERCLA FRAMEWORK

Section 107(a) of CERCLA authorizes the United States to recover costs incurred in response to releases, or threats of release, of hazardous substances at a facility from four classes of liable parties or "covered persons": (1) current owners or operators of the facility; (2) owners or operators at the time of disposal of hazardous substances at the facility; (3) parties who arranged for disposal of hazardous substances at a facility; and (4) transporters of hazardous substances which have been disposed of at the facility. *See* 42 U.S.C. § 9607(a).

The Superfund, a revolving fund created by Congress, finances EPA cleanups of hazardous waste releases. *See* 26 U.S.C. § 9507. The Superfund may then be replenished by suits brought under § 107 of

CERCLA. *See United States v. Best-foods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

Courts have recognized that as a remedial statute, CERCLA should be construed liberally in order to effectuate its goals. *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 258 (3d Cir.1992). There are, however, clear limits to CERCLA's reach. As the Second Circuit noted, CERCLA does not "automatically assign liability to every party with any connection to a contaminated facility." *Commander Oil Corp. v. Barlo Equipment Corp.,* 215 F.3d 321, 327 (2d Cir.2000).

### 3. Operator Liability

The Government claims that Defendants are liable under CERCLA as "operators" at the Site during the installation of utility communication lines. Qwest contends that there is no set of facts that the Government could prove that would give rise to operator liability under § 107(a)(2) of CERCLA.

CERCLA imposes liability on the "owner and operator of a vessel or a facility." 42 U.S.C. § 9607(a). The statutory definition of an "operator" is unclear and circular. *Id.* § 9601(20)(A)(ii) (an operator is "any person operating such facility"). Therefore, the Supreme Court was forced to give the term its "ordinary or natural meaning." *See Bestfoods,* 524 U.S. at 66, 118 S.Ct. 1876. The Court stated that

> under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. . . . *[A]n operator must manage, direct, or conduct operations specifically related to pollution,* that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66–67, 118 S.Ct. 1876 (emphasis added).

The Government argues that Defendants' conduct falls directly in line with the definition of an "operator" as provided in *Bestfoods,* stating that Defendants "operated" the drilling to install underground communication lines that resulted in the leakage and disposal of hazardous substances into the environment. The Government further asserts that a party's status as a contractor does not preclude it from being held an operator as long as it controlled the phase where the contamination occurred. *See Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.,* 976 F.2d 1338, 1340–42 (9th Cir. 1992); *United States v. Warner Brothers Well Drilling, Inc.,* 899 F.2d 15, 1990 WL 37610 (6th Cir.1990).

Qwest distinguishes *Kaiser* and *Warner Brothers* from the current situation. In both of those cases, the party found to be an "operator" had a contractual relationship with the party who controlled the remediation efforts on the site. In the present case, there was no contractual relationship for the utility work between either defendant and the EPA or between Defendants and any owner or operator of the MacGillis Site.

Qwest further argues that its tenuous relationship to the MacGillis Site precludes it from being an "operator." Defendants' installation of the communication lines did not take place on the MacGillis Site. Rather, it took place on a utility corridor located in a public right-of-way outside the boundaries of the Site. Because the Supreme Court has defined a CERCLA operator as "someone who directs the workings of, manages, or conducts the affairs of a facility," Qwest asserts that it cannot be an operator under CERCLA. *Bestfoods,* 524 U.S. at 66, 118 S.Ct. 1876.

Neither party has offered any authority that addresses whether a utility contractor could be held liable as an operator under

similar circumstances. Qwest points to this lack of binding or even persuasive authority as evidence that the Government is attempting an improper expansion of CERCLA liability. A number of courts have, however, hesitated to assign operator status in cases where there is a tenuous relationship between a party and a facility. *See, e.g., United States v. Vertac Chemical Corp.*, 46 F.3d 803, 808 (8th Cir. 1995) (finding the United States was not sufficiently involved in the activities of an herbicide facility to constitute actual or substantial control as an operator of a facility under CERCLA); *Interstate Power Co. v. Kansas City Power & Light Co.*, 909 F.Supp. 1284, 1288–89 (N.D.Iowa 1994) (holding that even though the contractor was working on the superfund site and engaged in the excavation of large of amounts of contaminated soil and discharge of contaminated groundwater into an adjacent creek, the contractor did not meet the standard for operator liability).

This Court agrees that the Government is seeking to expand the definition of operator liability well beyond the plain language of § 107(a)(2) and beyond any definition offered by a court. Viewing all the facts alleged in the Amended Complaint as true, this Court finds that the Government cannot state a claim of operator liability under CERCLA.

Defendants did not conduct any activities relating to the handling and management of hazardous substances on the Site. Neither did their utility work on the land adjacent to the Site "specifically relate to pollution."

The Government erroneously argues that by inadvertently damaging an unmarked forcemain, Defendants "operated" a facility which caused pollution at the Site. Defendants, however, had absolutely no control over the forcemains. They were not even aware of the existence of a forcemain until URI inadvertently damaged it during its unrelated activities of installing communication lines. Rather, it was the EPA that "operated" the forcemains under the *Bestfoods* standard and any reasonable sense of the term. The EPA designed the forcemains, installed them, and placed the groundwater into them.

In fact, the Government only alleges that Defendants controlled the *drilling activities* at the right-of-way adjacent to the MacGillis Site and claims this is sufficient to make Defendants "operators." The Government never, however, alleges that Defendants had any actual control over the Site or the forcemains that extended from it. *See Vertac*, 46 F.3d at 808. While URI's accidental rupture of the forcemains may be grounds for liability a different theory, such contact does not transform Defendants into CERCLA operators that direct, manage, or conduct the affairs of the facility.

The legislative history of CERCLA also undercuts the Government's attempt to extend CERCLA operator liability to anyone who inadvertently comes into contact with hazardous substances from a Superfund site. Rather, Congress intended for CERCLA to target "those industries and consumers who profit from products and services associated with the hazardous substances which impose risks on society," *see* 126 Cong. Rec. S14962 (Nov. 24, 1980), *reprinted in* Superfund, Vol. II at 258, or at parties whose business it is to deal with hazardous waste that is considered an "ultrahazardous activity." *See* 12 Cong. Rec. E4197 (daily ed. Sept. 4, 1980), *reprinted in* Superfund, Vol. II at 312. CERCLA was also targeted at parties who generate, ship, transport or dispose of waste, *see* H.R. Rep. 96–1016, Part I, *reprinted in* Superfund, Vol. II at 429, 445, and "those who control hazardous wastes throughout the whole process of disposal." *See*

H.R.Rep. No. 96–848 (1980), *reprinted in* Superfund, Vol. II at 477, 481, 483–84.

Defendants do not fall within any of these categories. Defendants are unrelated businesses that only indirectly came into contact with the pollution activities of the Site while installing communication lines in the adjacent right-of-way.

The Government has not alleged any facts, nor are there any facts that it could prove in this case, that would bring Defendants within the definition of an operator such that CERCLA liability could be imposed. Plaintiff's action must therefore be dismissed.

IT IS HEREBY ORDERED that:

1. Defendant Qwest Corporation's Motion to Dismiss [Docket No. 5] is GRANTED.

2. Plaintiff's Amended Complaint [Docket No. 14] against Defendant Qwest Corporation and Defendant Utility Resources, Inc. is DISMISSED.