## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-50283

United States Court of Appeals
Fifth Circuit

**FILED**
August 31, 2020

Lyle W. Cayce
Clerk

TEXAS WORKFORCE COMMISSION,

      Plaintiff - Appellee

v.

UNITED STATES DEPARTMENT OF EDUCATION, REHABILITATION
SERVICES ADMINISTRATION,

      Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:17-CV-26

Before CLEMENT, HIGGINSON, and ENGELHARDT, Circuit Judges.

KURT D. ENGELHARDT, Circuit Judge:

Plaintiff-Appellee Texas Workforce Commission (the Commission) alleges that the Army[1] violated the Randolph-Sheppard Act, 20 U.S.C. § 107 *et seq*., by failing to give priority to blind vendors in the bidding process for a vending facility services contract at an Army base cafeteria. An arbitration panel found in favor of the Army. The Commission appealed the panel's

---

[1] Upon judicial review, the Department of Education (the Department) is substituted as the defendant for the Army. *See* 5 U.S.C. § 703 ("If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.").

No. 19-50283

decision to the district court. The district court granted summary judgment in favor of the Commission and set aside the panel's decision.  We AFFIRM.

I.

Congress established the Randolph-Sheppard Act (the Act) "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting . . . ."  20 U.S.C. § 107(a). To that end, the Act gives blind persons priority in the bidding process for contracts to operate vending facilities on federal property.  *Id.* at § 107(b).  The Secretary of Education (the Secretary) administers the Act and prescribes its implementing regulations.  *See id.* at § 107a; 34 C.F.R. § 395 *et seq.*  For these vending facility contracts, designated state agencies, called State Licensing Agencies (SLAs), contract with the federal government on behalf of blind vendors.  34 C.F.R. § 395.33(b).

Here, the Texas Workforce Commission is the SLA which sought to bid on vending facility services contracts for cafeterias at Fort Bliss, a U.S. Army base in Texas.  The Army has two types of contracts for its cafeterias: Full Food Services (FFS) and Dining Facility Attendant (DFA) services.  FFS contracts cover activities that comprise the full operation of an Army dining facility, such as requisitioning, receiving, storing, preparing, and serving of food.  DFA contracts cover activities required to perform janitorial and custodial duties, such as sweeping, mopping, pot and pan cleaning, and other sanitation-related functions.

From 2003 to 2014, six cafeterias at Fort Bliss fell under one contract held by one blind vendor.  But in late 2014 following the contract's expiration, the Army split the work into two separate contracts: one for FFS services and one for DFA services.  Although the Commission continued to receive bidding

priority for the FFS contract, the Army set aside the DFA contract for bidding only by small businesses, effectively excluding the Commission from the bidding process for the DFA contract. Herein arises the dispute on appeal.

The Commission sought arbitration to challenge the Army's solicitation of bids for this DFA contract without applying the provisions of the Act to the selection process.[2] The Army contends that the DFA contract is not for the "operation" of a cafeteria; therefore, the Act does not apply, and blind vendors need not receive priority in the bidding process. The Commission, by contrast, asserts that the Act applies to all contracts pertaining to the operation of cafeterias on federal property, such that the Army violated the Act when it failed to give the Commission priority in bidding on the DFA contract. The arbitration panel majority concluded that because "military personnel retain[ed] responsibility for performing management operations, headcount and cashier services, cooking, and menu planning and serving food at those facilities," the Army was not required to comply with the Act when soliciting bids for DFA contracts.[3]

The Commission subsequently sought judicial review of the arbitration panel's decision. The district court, concluding that the DFA contract at issue is subject to the Act, granted summary judgment for the Commission and set aside the arbitration panel's decision. This appeal followed.

---

[2] Under the Act, disputes between a federal agency and an SLA are resolved by a three-person arbitration panel; each party designates a panel member, and those two panel members choose the third member. 20 U.S.C. §§ 107d-1, 107d-2. These panel decisions are subject to judicial review as final agency actions under the Administrative Procedure Act. *Id.* at §§ 107d-1(b), 107d-2(a); *see* 5 U.S.C. §§ 701–06.

[3] Importantly, the arbitration panel did not conduct its analysis on a case-specific basis but instead generally concluded that DFA contracts do not fall under the Act. Moreover, the panel majority neglected to address whether the Army, by splitting the work into two separate contracts, placed a limitation on the operation of the vending facility without first justifying it in writing to the Secretary, as required by the Act. *See* 20 U.S.C. § 107(b).

No. 19-50283

## II.

Under the Act, an arbitration panel's decision is subject to review as a final agency action under the Administrative Procedure Act.  5 U.S.C. § 706(2). A court must set aside that action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  We review *de novo* the district court's grant of summary judgment.  *Bridges v. Empire Scaffold, LLC*, 875 F.3d 222, 225 (5th Cir. 2017); *see* FED. R. CIV. P. 56(a).

## III.

The pivotal question here is whether the DFA contract at issue is subject to the Act; the answer turns on the meaning of "operate"[4] as it is used in the Act.  The Act authorizes "blind persons . . . to *operate* vending facilities on any Federal property," and states that "[i]n authorizing the *operation* of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency."  20 U.S.C. § 107(a)–(b) (emphasis added).

The Army contends that "operate" means to direct or manage, implicating a level of executive authority, and because the DFA contract here is only for janitorial and custodial-support services, the contract is not for the "operation" of the cafeteria and does not fall under the Act.  The Commission, by contrast, contends that the services covered by the DFA contract are integral to the operation of the cafeteria; therefore, the Act applies, and the Commission should have received priority in bidding on the contract.  Because neither the statute nor its implementing regulations make a distinction between the Act's applicability to FFS versus DFA contracts,  *see* 20 U.S.C. §

---

[4] Our discussion of the term "operate" extends to other variations of the word, i.e. "operation" or "operator."

4

No. 19-50283

107(a)–(b); 34 C.F.R. § 395.33, in order to determine the reach of the Act, we must first determine what it means to "operate" a vending facility.

## A.

We begin our statutory interpretation by inquiring whether the meaning of the term "operate" is ambiguous. "When the words of a statute are unambiguous . . . judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (internal quotation marks and citation omitted). The Act does not define "operate" or "operation," *see* 20 U.S.C. § 107e, and we do not find that the term's plain meaning is resolved after reviewing multiple dictionary definitions.[5] Nevertheless, the Department contends that the "ordinary or natural meaning" of "operate" is unambiguous based on the Supreme Court's and our court's interpretation of the term in *Bestfoods* and *Nature's Way Marine*. *See United States v. Bestfoods*, 524 U.S. 51 (1998); *United States v. Nature's Way Marine, L.L.C.*, 904 F.3d 416 (5th Cir. 2018). We, however, are hesitant to rely on *Bestfoods* and *Nature's Way Marine* for the ordinary and natural meaning of "operate" given the contextual differences between those cases and the instant case.

In *Nature's Way Marine*, our court followed the Supreme Court's interpretation of "operate" in *Bestfoods* and held that "an 'operator' of a vessel under the [statute] would include someone who directs, manages, or conducts the affairs of the vessel." *Nature's Way Marine*, 904 F.3d at 420–21.

---

[5] The dissenting opinion cherry-picks three dictionary definitions to support its assertion that to "operate" a cafeteria unambiguously means to have some level of executive control over it. But it fails to list a number of other definitions that do not implicate a requisite level of control. For example, The Oxford English Dictionary includes a definition for "operate" that means to "produce an effect; to act, work." *Operate*, OXFORD ENGLISH DICTIONARY (3d ed. 2004). Merriam-Webster defines it as "to perform a function" and "to put or keep in operation." *Operate*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/operate (last visited Aug. 18, 2020). Moreover, even the definitions quoted by the dissenting opinion carry alternative meanings. A review of all dictionary definitions reveals that the term "operate" does not bear a singular, plain meaning.

No. 19-50283

Importantly, Judge Elrod, writing for the court, noted that the statutes in *Bestfoods* and *Nature's Way Marine* "have common purposes and a shared history" and the "parallel language between the two statutes is significant." *Id.* at 420. Indeed, the statute in *Bestfoods* "define[d] . . . 'operator' with the exact same language" as the statute at issue in *Nature's Way Marine, id.*, so it is unsurprising that the court in *Nature's Way Marine* adopted the *Bestfoods* court's ordinary and natural meaning of the word. *See United States v. Meade*, 175 F.3d 215, 220 (1st Cir. 1999) (noting that the use of parallel language or construction in different statutes may inform judicial interpretation).

However, no such commonality exists between the Act in the instant case and either of those statutes. The shared purpose of the *Bestfoods* and *Nature's Way Marine* statutes centers on liability and compensation for environmental pollution. *See generally* 33 U.S.C. §§ 2701–2762; 42 U.S.C. §§ 9601–9675. Given that context, it would be fair to say the ordinary and natural meaning of "operator" is a person who "directs, manages, or conducts" the affairs of the facility or vessel because a level of control or responsibility is implicated when liability is involved. But no liability is implicated by the Act here. Quite the opposite, the Randolph-Sheppard Act was enacted to benefit blind persons by providing them with greater employment and economic opportunities. The Act has a "distinct, focused, and singular purpose" that is not covered by the *Bestfoods* or *Nature's Way Marine* statutes. *See Meade*, 175 F.3d at 221.

Furthermore, the word the *Bestfoods* and *Nature's Way Marine* courts analyzed was "operator," but the whole term as listed in the definitions section of both statutes is "owner or operator." So, it is also unsurprising that the courts interpreted "operator" to mean a person with some sort of executive control or authority because "operator" was defined in tandem with "owner." By contrast, in the instant case, the Army "owns" the cafeteria, whereas the third party managing the services contract "operates" the vending facility.

6

Unlike the statutes in *Bestfoods* and *Nature's Way Marine*, under the Act here, the party who "operates" the vending facility cannot and should not be defined in the same way as the "owner."

Because of the significant contextual distinctions, we cannot unequivocally say that "operate" carries the same meaning in a pollution liability statute as it does in an employment opportunity statute. "[T]he presumption of consistent usage can hardly be said to apply across the whole *corpus juris*. Frequently when a court is called on to construe a statutory word or phrase, counsel for one side will argue that it must bear the well-established or unavoidable meaning that the same word or phrase has in a different statute altogether. Without more, the argument does not have much force[.]" Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 172 (2012). "[P]recedent teaches that the case for construing one statute in a manner similar to another is weakest when the two have significant differences." *Meade*, 175 F.3d at 221 (referencing *United States v. Granderson*, 511 U.S. 39, 50–51 (1994)); *cf.* Walter Wheeler Cook, *"Substance" and "Procedure" in the Conflict of Laws*, 42 YALE L.J. 333, 337 (1933) ("The tendency to assume that a word which appears in two or more legal rules . . . has and should have precisely the same scope in all of them . . . must constantly be guarded against."). "[T]he mere fact that the words are used in each instance is not a sufficient reason for treating a decision on the meaning of the words of one statute as authoritative on the construction of another statute." Rupert Cross, *Precedent in English Law* 192 (1961). Accordingly, our inquiry into the meaning of the word "operate" should not begin and end with *Bestfoods* and *Nature's Way Marine*. Although we need not dismiss their interpretations of the word entirely, further investigation is required.

A case which presents a more instructive interpretation of "operate" is *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015). In *Ivy*, our court was tasked with

determining the meaning of "operations," as it was used in the Rehabilitation Act. *Id.* at 254–55. There, the plaintiffs, who were deaf individuals, brought suit against the Texas Education Agency (TEA) to bring driver education into compliance with the Americans with Disabilities Act and the Rehabilitation Act. *Id.* at 252–53. The key question was whether the plaintiffs had been excluded from participation in or denied the benefits of the services, programs, or activities of the TEA. *Id.* at 254–55. To answer that question, our court had to determine whether driver education is a "service, program, or activity" of the TEA. *Id.* The Rehabilitation Act defined "program or activity" as "all the operations of" a public entity. *Id.* at 255 (citing 29 U.S.C. § 794(b)). Judge Clement, writing for the court, then offered the following explanation: "In the context of interpreting this definition, we have explained that Webster's Dictionary broadly defines 'operations' as 'the whole process of planning for and operating a business or other organized unit,' and defines 'operation' as 'a doing or performing esp[ecially] of action.'" *Id.* (citing *Frame v. City of Arlington*, 657 F.3d 215, 227 (5th Cir. 2011)).

The *Ivy* court's broad interpretation of "operate" is particularly instructive here because the purposes of the Rehabilitation Act and the Randolph-Sheppard Act are strikingly similar. The Rehabilitation Act lists several purposes including "to empower individuals with disabilities to maximize *employment*, *economic self-sufficiency*, *independence*, and inclusion and integration into society." 29 U.S.C. § 701(b)(1) (emphasis added). The Randolph-Sheppard Act likewise is "[f]or  the purposes of providing blind persons with remunerative *employment*, enlarging the *economic opportunities* of the blind, and stimulating the blind to greater efforts in striving to make themselves *self-supporting*." 20 U.S.C. § 107(a) (emphasis added). Clearly, these two statutes have similar purposes—to give disabled persons greater employment and economic opportunities. Accordingly, the *Ivy* court's

No. 19-50283

explanation is informative to our statutory analysis in the instant case. [6]  *See Meade*, 175 F.3d at 215.

Because the *Bestfoods* and *Nature's Way Marine* courts and the *Ivy* court present reasonable, yet contrasting, interpretations for the meaning of "operate," and the Act here provides no clear definition, we find that the term is ambiguous.

The dissenting opinion contends that the term's meaning is unambiguous. However, it took eight pages to explain how it reached that conclusion, only to concede on the last page that "other senses of *operate* exist." And we have also reviewed the dictionary definition of "ambiguous": "capable of being understood in *two or more possible senses* or ways." *Ambiguous*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/ambiguous (last visited Aug. 18, 2020) (emphasis added). Indeed, it is difficult to contemplate how the *Bestfoods* case could have made it to the steps of the Supreme Court were the term's meaning plain and unambiguous. And the term's ambiguity cannot be resolved by the Court's construction in *Bestfoods* and later adopted by our court in *Nature's Way Marine* because the meaning of an ambiguous term, by its very nature, changes depending on its usage.

**B.**

Finding that the statutory language is ambiguous, we must now construe the meaning of "operate" based on the context in and purpose for which it is used. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006) (finding that the word "located" is a chameleon word in that its meaning depended on its context and purpose).

---

[6] The dissenting opinion's suggestion that *Ivy* does not support a broad interpretation of "operate" is perplexing given that the *Ivy* court expressly states that the term is "broadly define[d]." *See Ivy*, 781 F.3d at 255. Furthermore, that the *Ivy* court found driver education fell outside the ambit of the Rehabilitation Act is neither here nor there. It is *Ivy*'s definition of "operate" that is relevant to the instant case.

No. 19-50283

Justice Scalia identified one of the fundamental principles of reading law to be a presumption against ineffectiveness. That is, a textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored. Scalia & Garner, *supra,* at 63–65. Here, although the meaning of "operate" is ambiguous, the purpose of the Act is not:

> *For the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting,* blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property.

20 U.S.C. § 107(a) (emphasis added). We should not use the Act's purpose to expand the meaning of the term "operate" beyond its permissible meaning. *See* Scalia & Garner, *supra,* at 35. But, as the district court noted, "operate" could be fairly read as including all necessary tasks to the functioning of a cafeteria or only those tasks which implicate a level of control or authority. Either interpretation of the word is reasonable and permissible. A broader reading of "operate" which includes more than only executive-level functions would further the Act's purpose; therefore, applying a presumption against ineffectiveness, it is the more favorable interpretation.

Additionally, prior to 2014 when the Army split the vending facility contract into two, the same custodial and sanitation services now at issue, as part of the then single vending facility contract, were subject to the Act. Accordingly, the dissent is mistaken that our interpretation of "operate" conflicts with its ordinary usage. On the contrary, the customary application of the Act had previously included these services that are now in a separate DFA contract. To hold that the DFA contract now does not fall under the ambit of the Act because it is not for the "operation" of the cafeteria is inconsistent with the Act's customary application to these services. *See* John F. Manning,

10

*What Divides Textualists from Purposivists?*, 106 COLUM. L. REV. 70, 92–93 (2006) ("Textualists start with contextual evidence that goes to customary usage and habits of speech . . . When contextual evidence of semantic usage points decisively in one direction, that evidence takes priority over contextual evidence that relates to questions of policy."). Again, this cuts against the dissent's narrow interpretation of "operate." *Cf. Abramski v. United States*, 573 U.S. 169, 179 (2014) (noting that we must interpret an ambiguous word not in a vacuum but with reference to, among other things, the statute's historical application).

A broader interpretation of "operate" is further supported by a March 5, 2018 letter from the Secretary of Education. In her letter, which was issued after the arbitration panel's decision in the instant case, the Secretary notes the existence of a dispute over the types of contracts to which the Act applies and, in no uncertain terms, states that the Department believes the Act applies to both FFS and DFA contracts. The Secretary then directly discusses the term "operation" as it is used in the Act:

> Nothing in the Randolph-Sheppard Act requires a vendor to participate in every activity of the cafeteria in order to "manage" or "direct the working of" the cafeteria. Where a vendor is responsible for all the functions of the cafeteria aside from those performed by military personnel—such as supervisory, administrative, and sanitation-related functions—the vendor can be said to "manage" the cafeteria, even if the vendor is not preparing the food. Indeed, the cafeteria would not be able to operate without the vendor performing those functions.

The Secretary further clarified that the Act may not apply to all DFA contracts, such as those which are limited to discrete tasks. But the Secretary subsequently points to an example of a DFA contract that did fall within the Act's applicability. In that case, concerning a DFA contract for services at a cafeteria at Fort Riley, Kansas, the panel concluded that the Act applied to the

DFA contract because the contract "include[d] tasks that constitute an integral element of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria, or tasks that without which the cafeterias would not be able to function." *See Kan., Dep't of Children & Family Servs. v. U.S. Dep't of the Army, Fort Riley*, Case No. RS/15-15 (May 9, 2017), https://www2.ed.gov/programs/rsarsp/arbitration-decisions/r-s-15-15.pdf. Following this case cite, the Secretary concludes, "[t]he Department takes seriously its responsibility to administer the Randolph-Sheppard Act and to follow the congressional aim 'to foster the *expansion* of the Randolph-Sheppard program to its *fullest potential*.'" (emphasis added). The Secretary's language here favors a broader interpretation of "operate" in the context in which it is used within the Act. Although the Secretary's letter does not carry the force of law, we find it presents a "reasonable interpretation" of the Act, such that it is persuasive and is therefore "entitled to respect." *See Christensen v. Farris Cty.*, 529 U.S. 576, 587 (2000). Accordingly, the district court did not err in holding that the Act may apply to DFA contracts generally.

We now turn to the DFA contract at issue here.[7] Upon reviewing the contract's language and enumerated tasks, we conclude that the DFA contract is subject to the Act. The Performance Work Statement (PWS) of the DFA contract states that "[t]his contract includes all functions, tasks, and responsibilities normally performed by a Food Service Operation." Furthermore, the contract is not limited to "discrete tasks" and instead lists several pages of specific tasks all for the combined purpose of providing

---

[7] Unlike the arbitration panel, we conclude that there is no bright-line rule with respect to the Act's applicability to DFA contracts; instead, each contract must be examined on a case-by-case basis according to the contract's individual particularities. Consequently, our ruling here does not foreclose similar issues on appeal in other cases, e.g. *SourceAmerica v. U. S. Dep't of Educ.*, 368 F. Supp. 3d 974 (E.D. Va. 2019), which is currently pending appeal in the Fourth Circuit.

sanitation-related functions, which the Secretary identified as necessary to the operation or "manage[ment]" of a cafeteria.  These tasks include, but are not limited to, the following: providing "[c]lean and sanitized dinnerware, utensils, and trays . . . to diners without delay 100% during" meal services; cleaning food and beverage spills during meal services "within [five] minutes of occurrence"; cleaning and sanitizing all food service equipment and containers;  preparing, maintaining, and cleaning dining areas and "afford[ing] each diner a clean area to eat without delay.  The dissent mistakenly suggests our opinion adopts a meaning of the term "operate" where if you're involved "even a little bit" in causing something to function, you "operate" that thing.  That suggestion is so far afield from what we hold here today.  We hardly see how a vendor who is in charge of the litany of functions *supra*—in addition to others not enumerated in our opinion—is involved in the cafeteria's operation only "a little bit."  And we, in no uncertain terms, state that the Act may not apply to other DFA contracts, such as ones limited to a discrete task.  But in the DFA contract before us, these tasks, taken together, involve operating the cafeteria.[8] Accordingly, the district court did not err in holding that the DFA contract falls within the terms of the Act, such that the Army violated the Act by not giving the Commission priority in the bidding process.

For the reasons stated herein, the district court's order granting summary judgment in favor of the Commission and setting aside the arbitration panel's decision is AFFIRMED.

---

[8] The dissent further laments that in reaching this conclusion we have applied a definition of what it means to "operate" a cafeteria from an arbitration panel ruling on the very same issue before us today.  *See Fort Riley*, Case No. RS/15-15.  And?  Our construction of the term's meaning, in light of the context and purpose for which it is used in the Act, comports with that panel's analysis of an analogous DFA contract.  The only "mystery" that remains is why the dissenting opinion prefers a definition of "operate" pulled from cases that have several stark statutory and factual distinctions.

No. 19-50283

EDITH BROWN CLEMENT, Circuit Judge, dissenting:

The issue here is whether this custodial-services contract is a contract to "operate" a cafeteria. The majority holds that it is. But that's not how an ordinary English speaker uses *operate*. And nothing about how this statute or its implementing regulations use *operate* or *operation* suggests a different contextual meaning. There will be cases where determining whether a contract entails the "operation" of a cafeteria will be hard. This isn't one of them. I therefore respectfully dissent.

I.

The "first" and "cardinal canon" of statutory construction is that the "legislature says in a statute what it means and means in a statute what it says." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). So, "[w]hen the words of a statute are unambiguous, . . . this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). *Operate* and *operation*, as they are used in the Randolph-Sheppard Act, have a plain, unambiguous meaning: to "operate" a cafeteria means to have some level of executive control over it. All our usual interpretive sources support this meaning.

U.S. Supreme Court case law supports this meaning. In *United States v. Bestfoods*, 524 U.S. 51 (1998), the Court construed what "operating" a facility meant. The Court stated that, "[i]n a mechanical sense, to 'operate' ordinarily means '[t]o control the functioning of; run: *operate a sewing machine.*' And in the organizational sense . . . , the word ordinarily means '[t]o conduct the affairs of; manage: *operate a business.*'" *Id.* at 66 (citation omitted) (quoting AMERICAN HERITAGE DICTIONARY 1268 (3d ed. 1992)). The unanimous Court applied the organizational sense of *operate*, holding that "an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Id.*

14

No. 19-50283

This circuit's case law supports this meaning. In *United States v. Nature's Way Marine, L.L.C.*, 904 F.3d 416, 417–18 (5th Cir. 2018), we construed what "operating" a vessel meant—there, the vessels were two barges that the defendant was moving with its tugboat. We too applied the organizational sense of *operate*, holding that "the ordinary and natural meaning of an 'operator' of a vessel" is one "who directs, manages, or conducts the affairs of the vessel." *Id.* at 420–21.

Definitions in leading dictionaries support this meaning. The Oxford English Dictionary defines *operate* to mean "to manage, to direct the operation of." *Operate*, OXFORD ENGLISH DICTIONARY (3d ed. 2004). Webster's Third New International Dictionary defines it to mean "to manage and put or keep in operation whether with personal effort or not" such as "*operated* a grocery store." *Operate*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (2002). And, as already cited, the American Heritage Dictionary defines it to mean "[t]o conduct the affairs of; manage: *operate a business*." *Operate*, AMERICAN HERITAGE DICTIONARY, *supra*, *quoted in Bestfoods*, 524 U.S. at 66.[1]

The way this statute and its implementing regulations use *operate* and *operation* supports this meaning. Section 107a(d)(2)(B)(ii) of the Act addresses when the "operation" of a cafeteria "would be in . . . competition with" an incumbent "restaurant or other food facility." 20 U.S.C. § 107a(d)(2)(B)(ii). This suggests that a vendor's contract is for the "operation" of a cafeteria only if the vendor has some control over directing and managing the cafeteria—to say

---

[1] The majority claims that I selectively chose these definitions over others that support a different sense of *operate*. But of the three supposedly alternative definitions that the majority cites, two are for *operate* when used as an intransitive verb—*operate* is clearly used as a transitive verb here—and for the third, the majority leaves out Merriam-Webster's usage example, which conflicts with how the majority uses *operate* and is the same as the example I quote from Webster's Third: "*operated* a grocery store." In any event, the majority doesn't explain how these definitions support its sense of *operate*.

15

that a vendor without executive control over the cafeteria's food or its pricing is in "competition" with another food facility would strain the ordinary and natural meaning of *competition*. For example, it wouldn't make sense to say that a vendor with a contract to clean dishes at restaurant *A* is in competition with restaurant *B*. And 34 C.F.R. § 395.33(a) states that a blind vendor gets priority in the bidding process if its "operation" of the cafeteria is "at a reasonable cost, with food of a high quality comparable to that currently provided employees." This suggests that the "operation" of a cafeteria entails having some control over the food and its quality. Both of these uses suggest that a vendor who "operates" a cafeteria must to some degree direct, manage, or conduct its affairs, and likely must have some control over the food.

All these sources support that *operate* is used in the organizational sense here, and no authority suggests otherwise. Our judicial inquiry into this interpretive issue is therefore complete. All that's left is to apply the term's plain meaning to the contract. This custodial-services contract is for "activities required to perform janitorial and custodial duties within dining facilities," such as "sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions." None of these duties entail directing, managing, or conducting the cafeteria's affairs. Under this contract, the vendor doesn't order food, prepare food, serve food, determine what is served, determine how much to serve, determine what to charge for a meal, or have any other duties that might arguably suggest that the vendor has executive-level authority over the cafeteria's affairs. Thus, this contract is not for the "operation" of a cafeteria.

The majority, however, doesn't apply this organizational sense of *operate*. It applies a "broad" sense, holding that a vendor under this contract "operates" a cafeteria because its "tasks, taken together, involve operating the

cafeteria." That explanation isn't very helpful because, like the statutory definitions in *Bestfoods* and *Nature's Way*, it's circular. *Cf. Bestfoods*, 524 U.S. at 66 ("Here of course we may again rue the uselessness of [the statute's] definition of a facility's 'operator' as 'any person . . . operating' the facility . . . ." (quoting 42 U.S.C. § 9601(20)(A)(ii))); *Nature's Way*, 904 F.3d at 420 ("The statute does not define 'operating,' offering instead only the circular definition that an 'owner or operator' is 'in the case of a vessel, any person owning [or] operating . . . the vessel'" (quoting 33 U.S.C. § 2701(26)(A)(i))). What it means to "operate" a cafeteria remains a mystery.

The definition that the majority appears to use is from an arbitration panel ruling. That panel held that a contract is for the "operation" of a cafeteria if the contract "includes tasks that constitute an integral element of providing food service at a military cafeteria facility, . . . or tasks that without which the cafeterias would not be able to function." *Kan., Dep't of Children & Family Servs. v. U.S. Dep't of the Army, Fort Riley*, Case No. RS/15-15 (May 9, 2017), https://www2.ed.gov/programs/rsarsp/arbitration-decisions/r-s-15-15.pdf. Circularity problems aside, this sense of *operate* conflicts with ordinary usage.

Mopping the floor, cleaning the kitchen, and bussing tables are tasks that are integral to operating a restaurant. But if someone who did only those tasks claimed that he was "operating" a restaurant, an ordinary English speaker would think him confused, mistaken, or dishonest. Similarly, no ordinary English speaker would say that sanitizing the butcher counter at Whole Foods is "operating" a grocery store, that scrubbing the hull of a ship is "operating" a vessel, or that doing custodial work at a chemical plant is "operating" a facility. Yet that's what the majority's broad sense of *operate* would entail. Indeed, based on this broad sense, food suppliers, electricity providers, and plumbers—all of whom perform tasks that, without which, a

No. 19-50283

cafeteria could not function—"operate" a cafeteria. We shouldn't adopt a sense of *operate* that so obviously conflicts with how ordinary people use the word.

The majority disagrees. It claims that this sense of *operate* is consistent with ordinary usage. It reasons that, because the custodial services performed under this contract used to be performed under a larger contract that covered the whole vending facility, and because that contract was subject to the Randolph-Sheppard Act, holding that this custodial-services contract isn't for the "operation" of a cafeteria is inconsistent with how the Act is customarily applied to those services. I'm not sure that is an example of ordinary usage, but the argument is flawed, nonetheless. The majority incorrectly assumes that what is true of the whole is true of each of its parts—i.e., because someone who performs tasks *A–Z* "operates" a cafeteria, someone who performs only tasks *A–D* "operates" a cafeteria. Under that reasoning, a contract solely to sweep the floor would be a contract to "operate" a cafeteria so long as the prior contract included sweeping the floor. That obviously isn't right. What made the prior contract a contract to "operate" a cafeteria might have been everything *except* the custodial services. This argument therefore doesn't show that these custodial services, by themselves, constitute the "operation" of a cafeteria or that the majority's broad sense of *operate* is consistent with ordinary usage.

The Randolph-Sheppard Act clearly uses *operate* in the organizational sense. The Supreme Court, this court, and countless dictionaries confirm that *operate* has a settled, plain meaning when used in this sense. This plain meaning definitively resolves the question before us: Is this custodial-services contract a contract to "operate" a cafeteria? No, it isn't. Thus, the Act doesn't apply.

II.

The majority uses a different sense of *operate* because it finds an ambiguity. It claims that (a) *Ivy v. Williams*, 781 F.3d 250 (5th Cir. 2015),

supports this different, broad sense of *operate*, and (b) we can't rely on *Bestfoods* and *Nature's Way* because there are contextual differences between how *operate* is used in the statutes there and here. Both claims are wrong. We therefore have no reason to search for a different sense of the word.

A.

The majority's first claim is that *Ivy* uses a different sense of *operate*—a "broad" sense. It doesn't. In *Ivy*, the issue was whether the "plaintiffs ha[d] been 'excluded from participation in or . . . denied the benefits of the services, programs, or activities'" of the Texas Education Agency. *Id.* at 255 (quoting 42 U.S.C. § 12132). To resolve that issue, we had to determine whether driver education—the allegedly denied benefit—was an Agency service, program, or activity under the relevant statute. *Id.* That statute states that "'program or activity' means all of the operations of" a public entity. 29 U.S.C. § 794(b). That's why we cited definitions for *operations*—"the whole process of planning for and operating a business or other organized unit"—and *operation*—"a doing or performing esp[ecially] of action." *Ivy*, 781 F.3d at 255 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1581 (1993)). These definitions supposedly support the majority's broad sense of *operate*.

The majority doesn't explain how these definitions support its broad sense of *operate* or how that sense squares with how *operate* is used in this statute or its implementing regulations. Regardless, in *Ivy* we held that the Agency did "*not* operate or perform driver education because it [did] not teach driver education or contract with the schools that [did]." *Id.* (emphasis added). We held this even though the Agency is in charge of licensing such schools. *Id.* at 253–54. If *Ivy* supported the broad sense that the majority cites it for, that case would have gone the other way. The licensing of driver-education schools is integral to their operation—arguably more so than custodial work is to the

No. 19-50283

operation of a cafeteria. *Ivy* therefore doesn't support this broad sense of *operate*.[2]

B.

The majority's second claim is that we can't rely on *Bestfoods* and *Nature's Way* because of contextual differences in how the statutes in those cases use *operate*. The majority correctly notes that the statutes in *Bestfoods* and *Nature's Way* have a shared history, common purpose, and parallel language, and that they are about liability and compensation, not awarding government contracts. The statutes indeed have differences, but the way they use *operate* is the same. Those cases were about what it meant to "operate" a facility or vessel; this case is about what it means to "operate" a cafeteria. The statutes' differences, therefore, are not differences in usage.

Nevertheless, the majority finds these differences relevant. It points out that those statutes, unlike this one, rely on statutory definitions of an "owner or operator" and impose liability. But it's unclear how either point affects our analysis. In those statutes, *owner* and *operator* are separated by the disjunctive *or*, not *and*, so the meanings of those two words aren't necessarily related. Indeed, in *Nature's Way*, we held the defendant liable for operating barges that it didn't own. 904 F.3d at 418. In any event, neither case suggested that the word *owner* or the potential for liability affects what *operate* means.

On the liability point, the majority seems to reason that, because the broad sense of *operate* wouldn't fit with a statute that imposes liability, we can't infer much of anything from the sense of *operate* used in those statutes. The organizational sense, on the other hand, fits those statutes "because a level

---

[2] The Supreme Court vacated and remanded *Ivy* with instructions to dismiss the case as moot. *Ivy v. Morath*, 137 S. Ct. 414 (2016) (mem.). So even if *Ivy* supported a different sense of *operate*, that case is no longer precedential and, therefore, is poor evidence of an ambiguity.

of control or responsibility is implicated when liability is involved." I agree that liability usually involves some level of control or responsibility, but *that* isn't why the broad sense of *operate* is a poor fit.

Someone can be responsible for causing an injury without having executive-level control over the injury-causing thing. For example, consider if the tugboat accident in *Nature's Way* had been caused by the boat's mechanic. A mechanic undoubtedly performs tasks integral to the boat's functioning and, hence, the barges that the boat was moving. If the mechanic had caused the accident by negligently repairing the boat's engine, he would be at least partly responsible. He wouldn't be liable under the statute, however, because the statute limits liability to the person "owning" or "operating" the vessel. 33 U.S.C. §§ 2702(a), 2701(32)(A). The statute in *Bestfoods* similarly limits liability to the person "owning" or "operating" the facility. 42 U.S.C. § 9607(a). The majority seems to get this causal connection backwards—those statutes limit liability only to the person with executive-level control not because the statutes impose liability, but because they use the word *operate*. Thus, these attempts to distinguish *Bestfoods* and *Nature's Way* fail to show that any of these statutes use *operate* differently.

*Ivy* doesn't support a different sense of *operate* and *Bestfoods* and *Nature's Way* don't use *operate* differently than how it's used here. The majority's two reasons for finding an ambiguity therefore fail to show any such ambiguity. *Operate* has one clear sense here—the organizational sense—and the majority cites no authority that calls that into doubt.

### III.

To be sure, other senses of *operate* exist. *Operate* has a slightly different meaning in, for example, the medical and mechanical contexts. But the majority isn't applying those senses; it's applying what appears to be a novel sense of *operate* where, if you're involved—even a little bit—in causing

something to function, you "operate" that thing. This seems to be an attempt to solve a problem we don't yet have.

That problem is that, for some contracts, determining whether the vendor is "operating" a cafeteria will be difficult—e.g., does a vendor who is in charge of everything in the cafeteria except preparing the food "operate" the cafeteria? That case will be tough because we will have to determine how much executive-level control is necessary to constitute "operating" a cafeteria. That is, such a case will be tough not because the meaning of *operate* is ambiguous, but because its application to the facts will be debatable. At the margins, determining exactly how much executive control is required under this statute will be a difficult line-drawing problem. But it's a line we need not draw because for this contract, the vendor has no executive control over the cafeteria. That makes our job today easy. Wherever that line should be drawn, this contract falls well below it.

\*     \*     \*

Because "operating" a cafeteria entails having some level of control over the cafeteria's affairs, and the vendor under this custodial-services contract has none, I would hold that the Randolph-Sheppard Act doesn't apply to this contract. I therefore would remand for the district court to determine in the first instance whether the Army was required to "justify in writing to the Secretary" its decision to split the cafeteria work into two contracts. *See* 20 U.S.C. § 107(b). I respectfully dissent.