**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF HAWAII, Department of Human Services, Division of Vocational Rehabilitation, Hoopono-Services for the Blind, *Plaintiff-Appellee/ Cross-Appellant*, | Nos.   21-16242 21-16323 D.C. No. 1:17-cv-00430- LEK-RT |
| v. | |
| U.S. DEPARTMENT OF EDUCATION, Rehabilitation Services Administration, *Defendant-Appellant/ Cross-Appellee*, | OPINION |
| and | |
| UNITED STATES DEPARTMENT OF THE ARMY, *Defendant*. | |

Appeal from the United States District Court
for the District of Hawaii
Leslie E. Kobayashi, District Judge, Presiding

Argued and Submitted July 6, 2022
Honolulu, Hawaii

Filed August 30, 2022

Before:  Kim McLane Wardlaw, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Randolph-Sheppard Act

In an action brought by the State of Hawaii challenging the U.S. Department of the Army's changes to the operation of its dining facilities at Schofield Barracks and Wheeler Army Airfield in Honolulu, Hawaii, the panel reversed the district court's conclusion that the Randolph-Shepard Act ("RSA") did not apply to Dining Facility Attendant ("DFA") contracts, and affirmed the district court's conclusion that the RSA advance review provision applied to the reclassification of a Schofield Barracks contract.

Ho'opono, the Hawaii state agency charged with protecting the rights of blind vendors under the RSA, asserted that the Army failed to comply with its obligations under RSA by failing to prioritize blind vendors in the bidding process for a vending facilities services contract at the base's cafeteria, and by failing to obtain the Department of Education ("DOE")'s approval before it limited those operations. An arbitration panel found in favor of the Army on both issues, and Ho'opono appealed the panel's decision

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

to the district court.

The Army operates each of its dining facilities under either the Full Food Service (FFS) model (contracting out all cafeteria maintenance tasks), or the DFA model (members of the military perform most of the tasks required to maintain the dining facilities). The Schofield Barracks operated under an FFS model for the duration of the RSA contract with Ho'opono from 2005 to 2016. When the Army solicited new contracts for Schofield's dining facilities in 2016, it reclassified its dining facilities as DFA facilities. The Army decided against soliciting the contract under the RSA's requirements because the contract covered janitorial and custodial services only, and instead solicited the contract as a 100% Small Business Set-Aside, a form of contract on which Ho'opono is ineligible to bid. The Army did not seek or enjoin DOE's permission to reclassify its dining facilities maintenance contract from FFS to DFA.

The parties disputed whether the RSA applied to DFA contracts at all. The dispute turned on whether a DFA contractor, who primarily performs janitorial, custodial, and sanitization functions, "operates" a vending facility. If a DFA contractor was operating a vending facility, then the RSA priority applied. The panel agreed with Ho'opono's position that a DFA contractor operates a vending facility by fulfilling tasks that are integral to the operation of the dining hall. The panel held that the district court applied an incorrect standard of review to the RSA arbitration panel's construction of 20 U.S.C. § 107(a) when it deferred heavily to the arbitration panel's interpretation. Because the RSA did not delegate interpretive authority to the arbitration panel, the panel reviewed de novo. The panel held that the term "operate" was ambiguous in § 107(a). The panel held further that the statutory structure of the RSA supported a

broad interpretation in favor of increased opportunities for blind vendors, and the implementing regulations swept even more broadly and counseled strongly in favor of applying the RSA to DFA contracts. The RSA also defined "vending facility" in broad terms, suggesting that DFA contracts should fall under the RSA. The Secretary of Education has reached the same conclusion. The panel concluded that because the DFA contract for Schofield Barracks covered responsibilities that were integral to the cafeteria's operation, the RSA applied and the Army should have given RSA priority to blind vendors for the DFA contract.

The panel affirmed the district court's conclusion that the RSA advance review requirement applied to the Army's reclassification of Schofield Barracks' dining facilities. Examining the plain meaning of the statute's unambiguous terms, the panel concluded that the Army triggered the advance review requirement when it reclassified the Schofield Barracks dining facilities in a way that eliminated Ho'opono's eligibility to bid on the DFA contract. This action limited the ability of blind vendors to assert their RSA priority to the Schofield Barracks. Accordingly, the Army violated the RSA by failing to seek the Secretary's approval. The panel affirmed the district court's conclusion that the Army triggered the RSA advance review requirement by reclassifying Schofield Barracks' dining facilities as a DFA facility.

**COUNSEL**

Laura E. Myron (argued) and Mark B. Stern, Appellate Staff; Judith A. Philips, Acting United States Attorney; Brian M. Boynton, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants/Cross-Appellees.

Ryan W. Goellner (argued) and Matthew C. Blickensderfer, Frost Brown Todd LLC, Cincinatti, Ohio; Daniel F. Edwards, Taft Stettinius & Hollister LLP, Columbus, Ohio; James W. Walther and Lynne M. Youmans, Deputy Attorneys General; Department of the Attorney General, Honolulu, Hawaiʻi; for Plaintiff-Appellee/Cross-Appellant.

Andrew D. Freeman and James O. Strawbridge, Brown Goldstein & Levy LLP, Baltimore, Maryland, for Amici Curiae National Association of Blind Merchants and National Council of State Agencies for the Blind.

**OPINION**

WARDLAW, Circuit Judge:

Ho'opono, the Hawaii state agency charged with protecting the rights of blind vendors under the Randolph-Sheppard Act, *see* 20 U.S.C. §§ 107–107f, challenges the United States Department of the Army's (Army) changes to the operation of its dining facilities at Schofield Barracks and Wheeler Army Airfield in Honolulu, Hawaii. Ho'opono asserts that the Army failed to comply with its obligations under the Randolph-Sheppard Act by failing to prioritize blind vendors in the bidding process for a vending facilities services contract at the base's cafeteria, and by failing to

obtain the Department of Education's approval before it limited those operations.  An arbitration panel found in favor of the Army on both issues, and Ho'opono appealed the panel's decision to the district court.  The district court affirmed the arbitration panel on the bidding priority issue, but it reversed the arbitration panel on the advance review issue.  Unlike the district court, we conclude that blind vendors were entitled to priority in the bidding process for the Army's 2016 vending facilities services contract, but we agree with the district court that the Army violated the Randolph-Sheppard Act by failing to seek the Department of Education's approval before it limited its dining facilities' operations.

## I.

This case arises from the Randolph-Sheppard Act (RSA), *see* 20 U.S.C. §§ 107–107f, which Congress enacted in 1936 "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting," *id.* § 107(a).  In pursuit of this aim, the RSA requires federal agencies to give blind individuals priority for "the operation of vending facilities on Federal property." *Id.* § 107(b).  The United States Department of Education (DOE) implements the RSA, in part by "prescrib[ing] regulations to establish a priority for the operation of cafeterias on Federal property by blind licensees." *Id.* § 107d-3(e); *see also* 34 C.F.R. §§ 395.1–395.38.

The RSA defines "vending facility" to mean "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters, and such other appropriate auxiliary equipment as the Secretary may by regulation prescribe as being necessary for the sale of the articles or services

described in [20 U.S.C. § 107a(a)(5)] and which may be operated by blind licensees." 20 U.S.C. § 107e(7). The articles and services described in § 107a(a)(5) include the "vending of newspapers, periodicals, confections, tobacco products, foods, beverages, and other articles or services dispensed automatically or manually and prepared on or off the premises . . . and including the vending or exchange of chances for any lottery authorized by State law and conducted by an agency of a State." *Id.* at § 107a(a)(5).

Under the RSA, the Secretary of Education designates an agency for each state to act as a State Licensing Agency (SLA) for blind vendors within that state. *Id.* §§ 107a(a)(5), 107b. The SLA bids on federal contracts for vending services covered under the RSA and then licenses blind vendors to fulfill its contracts. *Id.* §§ 107a(a)(5), (b), 107b. For the contracts concerning the operation of cafeterias, an SLA receives priority if its proposal falls within a competitive range and is ranked among proposals that have a reasonable chance of being selected, so long as DOE determines that the vendor can fulfill the contract at a reasonable cost and at a level of quality comparable to that currently provided to federal employees. 34 C.F.R. § 395.33(a)–(b). When an SLA receives a contract, the blind vendors draw an income from the facilities' profits and from funds set aside under the RSA. 20 U.S.C. §§ 107b(3), 107d-3(a); 34 C.F.R. § 395.32.

Central to this appeal, the RSA also includes a "review requirement." If a federal agency plans to place "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States," the agency must provide a written justification to the Secretary of Education, "who shall determine whether such limitation

is justified." 20 U.S.C. § 107(b)(2). "A determination made by the Secretary pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination." *Id.* The Secretary publishes all such determinations in the Federal Register. *Id.*

Congress also established a method of dispute resolution for RSA disputes. *See id.* § 107d-1. An SLA may file a complaint with DOE if it determines that a federal department has violated the RSA. *Id.* § 107d-1(b). DOE then convenes an arbitration panel consisting of three people: one person designated by each party, and a third person appointed by the first two party designees to serve as a chairperson. *Id.* § 107d-2. We treat each arbitration panel decision as a final agency action subject to judicial review under the Administrative Procedure Act (APA). *See id.* §§ 107d-1(b), 107d-2(a); *see also* 5 U.S.C. §§ 701–706 (provisions governing APA review).

## II.

We now turn to the dispute at hand. This case concerns the operation of the dining halls at Schofield Barracks and Wheeler Army Airfield (Schofield Barracks) in Honolulu, Hawaii. In 2005, the Army entered into a contract with Ho'opono, the SLA for the State of Hawaii, for a five-year term under which James Theodore Chinn Jr., a blind vendor, provided cafeteria services at Schofield Barracks' dining halls. The Army renewed this contract for five more years in 2010, and in 2015, it exercised its contractual right to extend the contract for an additional six months, leaving it in effect until March 2016. In 2016, however, the Army made several important changes to its vending contract for Schofield Barracks.

To understand the 2016 changes to the vending services contract, some background on Army dining facilities operations is useful. The Army operates each of its dining facilities under one of two models: a Full Food Service (FFS) model or a Dining Facility Attendant (DFA) model. Under the FFS model, the Army contracts out all cafeteria maintenance tasks, including "requisitioning, receiving, storing, preparing, and serving of food," and "the performance of related administrative, custodial, and sanitation functions." The Schofield Barracks operated under an FFS model for the duration of its RSA contract with Ho'opono from 2005 to 2016.

But under the DFA model, members of the military themselves perform the lion's share of tasks required to maintain the dining facilities, including the requisition, receiving, storing, preparing, and serving of food, as well as service functions, payment services, and general administrative tasks. The Army's regulations prohibit its members from performing certain functions "on a regularly detailed basis without prior approval"—the regulations call these prohibited functions "DFA functions." DFA functions primarily consist of "janitorial and custodial duties," such as "sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions." Thus, for facilities operated under the DFA model, the Army itself maintains nearly all cafeteria functions, except for the limited DFA functions of janitorial and custodial duties, which the Army contracts out to another provider.

Although the Army had operated the Schofield Barracks under an FFS model from 2005–2016, when it solicited new contracts for Schofield's dining facilities in 2016, it reclassified its dining facilities as DFA facilities. According

to the Army, it switched classifications from FFS to DFA primarily because as combat operations in Iraq and Afghanistan wound down, the number of Army members that remained on base increased. With increased numbers of Army members on base, the Army determined that it could operate most dining facilities operations on its own and would therefore rely on contractors for DFA functions only.

When the Army solicited its DFA service contract in 2016,[1] then, it decided against soliciting the contract under the RSA's requirements because the contract covered janitorial and custodial services only. The Army instead solicited the contract as a 100% Small Business Set-Aside, a form of contract on which Ho'opono is ineligible to bid. In doing so, the Army did not seek or obtain DOE's permission to reclassify its dining facilities maintenance contract from FFS to DFA.

Because the Army's reclassification suddenly rendered Ho'opono ineligible for the Schofield Barracks contract, Ho'opono objected to the reclassification and sought legal recourse. Ultimately, Ho'opono filed a written request to initiate arbitration proceedings pursuant to 20 U.S.C. § 107d-2.[2]  At the arbitration proceedings, Ho'opono contended that the Army violated the RSA by soliciting DFA

---

[1] Initially, the Army applied the RSA priority to its 2016 solicitation, but it later amended its solicitation and removed the RSA priority.

[2]  When Ho'opono requested arbitration proceedings, it simultaneously filed a suit in federal court requesting an injunction prohibiting the Army from awarding a new contract for DFA services pending the resolution of the arbitration proceedings. The parties settled this suit upon the Army's agreement that it would extend the terms of the then-in-place FFS contract until the arbitration proceedings concluded.

services at Schofield Barracks,[3] and that the Army violated the RSA advance review requirement under 20 U.S.C. § 107(b).

The arbitration panel issued a split decision in July 2017, in which the majority ruled in favor of the Army. The panel majority concluded that the RSA does not apply to DFA contracts, reasoning that a contrary finding "would too greatly expand the intent of the RSA beyond its legislative intent of requirements of vending and dispensing of food." Additionally, the arbitration panel concluded that the Army did not violate the RSA's advance review requirement, which requires an agency to seek advance review from the Secretary of Education before enacting "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States," 20 U.S.C. § 107(b). The arbitration panel reasoned that applying the advance review provision to the Army's decision to reclassify a dining services contract from FFS to DFA would "seem to too heavily impact the Army's ability to operate."

Ho'opono then filed this action in the United States District Court for the District of Hawaii against DOE and the Army,[4] seeking review of the arbitration panel decision

---

[3] Ho'opono also contended that the Army's DFA solicitation violated the provisions prohibiting poaching in the John Warner National Defense Authorization Act for Fiscal Year 2007, but both sides now agree that these provisions are inapplicable to this appeal.

[4] Although DOE's Rehabilitation Services Administration is also a named defendant in this lawsuit, we refer to the defendants collectively as "the Army," as that is the federal entity advocating the defendants' position on appeal. Upon judicial review, the Department of Education is substituted as the defendant for the Army. *See* 5 U.S.C. § 703 ("If no

under the APA. *See* 5 U.S.C. §§ 551–59, 701–06. Ho'opono attacked the arbitration decision on two grounds: first, it argued that the Army violated the RSA's advance review provision by failing to seek the Secretary of Education's approval for reclassifying Schofield Barracks' contract as a DFA contract; and second, it argued that the RSA governs DFA service contracts.

Both sides moved for summary judgment, and on May 27, 2021, the district court partially granted and partially denied each summary judgment motion. The district court deferred to the arbitration panel's refusal to apply the RSA to DFA contracts, reasoning that this conclusion was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

However, the district court ruled in favor of Ho'opono on the RSA advance review requirement. The district court construed the word "limitation" in 20 U.S.C. § 107(b) to mean "something that bounds, restrains, or confines." Given this definition of "limitation," the district court concluded that the Army placed a limitation on the Schofield Barracks dining facilities by soliciting a DFA contract instead of an FFS contract, especially because this eliminated Ho'opono's opportunity to bid on the 2016–22 contract. The district court remanded the case to the arbitration panel with instructions to issue a decision consistent with its order.

The Army timely appealed the district court's interpretation of the RSA advance review provision. Ho'opono timely cross-appealed, challenging the district

special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.").

court's conclusion that the RSA does not govern DFA contracts.

## III.

We review a district court's grant or denial of summary judgment de novo. *Bell v. Wilmott Storage Servs.*, 12 F.4th 1065, 1068 (9th Cir. 2021). Generally, we review an arbitration panel's decision under the RSA as a final agency action under the APA. 20 U.S.C. § 107d-2(a). We thus must overturn the arbitration panel's decision if we find it "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This form of review includes deciding relevant questions of law, as well as interpreting relevant constitutional and statutory provisions. 5 U.S.C. § 706; *see also Sauer v. U.S. Dep't. of Educ.*, 668 F.3d 644, 650 (9th Cir. 2012). Because the RSA "does not delegate interpretive authority to the arbitration panel," we owe no deference to the arbitration panel's interpretation of the RSA or other statutes, and we review these interpretations de novo. *Sauer*, 668 F.3d at 650.

## IV.

The parties dispute whether the RSA applies to DFA contracts at all. The RSA provides that "blind persons licensed under [its] provisions . . . shall be authorized to operate vending facilities on any Federal property," 20 U.S.C. § 107(a), and that "[i]n authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency," *id.* § 107(b). Neither party disputes that the Schofield Barracks dining facilities are "vending facilities" under the RSA. Thus, this dispute turns on whether a DFA contractor, who primarily performs janitorial, custodial, and sanitization functions, "operates" a vending facility. In other words, if a

DFA contractor is operating a vending facility, then the RSA priority applies.  The Army argues that a DFA contractor does not operate a vending facility because a DFA contractor does not oversee and manage the food preparation in its dining halls.  Ho'opono argues, however, that a DFA contractor operates a vending facility by fulfilling tasks that are integral to the operation of the dining hall.  We believe Ho'opono has the better of the argument.

To begin, the district court applied an incorrect standard of review to the RSA arbitration panel's construction of 20 U.S.C. § 107(a).  The district court deferred heavily to the arbitration panel's interpretation, focusing primarily on whether its interpretation was arbitrary and capricious.  But as explained above, that standard does not apply to the construction of statutes by RSA arbitration panels.  Because the RSA "does not delegate interpretive authority to the arbitration panel," we owe no deference to the arbitration panel's interpretation of the RSA, and we review it de novo. *Sauer*, 668 F.3d at 650.  Thus, the district court should have independently interpreted the RSA, as a matter of law.

To interpret the meaning of "operate" in § 107(a), we begin by determining "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (citation omitted).  If a term is unambiguous, we merely apply the plain term. *Id.*  But if we find a term ambiguous, "we look to the congressional intent revealed in the history and purposes of the statutory scheme." *Pit River Tribe v. Bureau of Land Mgmt.*, 939 F.3d 962, 970 (9th Cir. 2019) (citation omitted).  To aid in this task, we look to "the statutory structure, and other traditional aids of statutory interpretation." *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Haw. Pension Plan*, 891 F.3d

839, 844 (9th Cir. 2018) (internal quotation marks and citation omitted).

The term "operate" is ambiguous in § 107(a). Neither the RSA itself nor the DOE regulations implementing the RSA define the term "operate" or "operation." *See* 20 U.S.C. § 107e; *see also* 34 C.F.R. §§ 395.1–395.38. We have yet to define "operate" within the meaning of the RSA, and when we have defined "operate" or "operation" in other contexts, our definitions have varied such that they provide little guidance here. *See, e.g.*, *Potts v. Cont'l Cas. Co.*, 453 F.2d 276, 278 (9th Cir. 1971) ("The word 'operated' may include both the owner-lessor of the plane and the [employer] and its pilot."); *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 849 (9th Cir. 2004) (defining "operate" based on the level of authority possessed).

Given the lack of a statutory definition, we next "consult common dictionary definitions" to divine the "ordinary, contemporary, common meaning" at the time the statute was enacted. *Cal. All. of Child & Fam. Servs. v. Allenby*, 589 F.3d 1017, 1021 (9th Cir. 2009) (citation omitted). As Ho'opono details in its briefing, consulting dictionaries proves unhelpful here, because there are several contending definitions of the word "operate," including "exercise force or influence," "produce an effect," "to exert oneself to do something," and "to produce the intended or proper effect." *Operate*, *Oxford English Dictionary* (1st ed. 1933). In the transitive sense, operate may also mean "to effect or produce by action or the exertion of force or influence," "to cause or actuate the working of," and "to direct the working of." *Id.* In fact, the arbitration panel in this case split over the meaning of the word operate. Given the lack of statutory definition and the abundance of dictionary definitions, the meaning of operate as used in the RSA is ambiguous.

The Army counters with the Supreme Court's *Bestfoods* decision as proof that the meaning of "operate" is settled. *See United States v. Bestfoods*, 524 U.S. 51 (1998). But *Bestfoods* is distinct from this case in several pertinent ways. There, the Supreme Court construed the meaning of "operate" within the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). The Supreme Court referenced a mechanical definition of operate as "to control the functioning of; run," as well as an organizational definition as "to conduct the affairs of; manage." *Id.* at 66 (alterations and citations omitted). The Court then concluded that due to CERCLA's unique qualities, it would construe "operate" in the organizational sense for the purposes of CERCLA. *Id.*

In the context of the RSA, however, it appears far less clear that Congress intended the organizational sense of operate. Whereas in CERCLA the statute targeted "operators" in the sense of those with authority to manage a project, the regulations implementing the RSA target a broader range of workers. The DOE regulations provide that "[s]uch operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible." 34 C.F.R. § 395.33(a). It would run counter to the RSA's sweeping and inclusive purpose to limit the term "operate" to include only those who "conduct the affairs of" or "manage" the entire operation of a dining facilities—clearly Congress wanted to provide jobs to blind vendors who "control the functioning of" and "run" dining facilities as well. Therefore, although the Supreme Court arrived at a conclusive definition of the term "operate" for the purposes of CERCLA, the term "operate" remains ambiguous for the purposes of the RSA.

Given this ambiguity, we turn to our other tools of statutory interpretation to determine Congress's intent. *See Pit River Tribe*, 939 F.3d at 970. And here, the statutory structure and implementing regulations counsel strongly in favor of applying the RSA to DFA contracts.

First, the statutory structure of the RSA invites us to interpret it broadly in favor of increased opportunities for blind vendors. The RSA begins by defining its own purposes as "providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a). The RSA's implementing regulations sweep even more broadly, mandating that the operation of cafeterias at federal agencies "shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible." 34 C.F.R. § 395.33(a). In fact, the Secretary's regulation requires that agencies renegotiate "[a]ll contracts or other existing arrangements *pertaining* to the operation of cafeterias on Federal property" to ensure they meet the RSA's requirements. *Id.* § 395.33(c) (emphasis added). While DFA contracts do not address the entire operation of dining facilities, they certainly *pertain* to the operation of dining facilities. Thus, including DFA contracts under the RSA increases the range of vending contracts for which blind vendors will receive priority, furthering the RSA purposes of increasing access to jobs for blind vendors.

The RSA also defines "vending facility" in broad terms, suggesting that DFA contracts should fall under the RSA. The statutory definition of vending facility includes "such other appropriate auxiliary equipment as the Secretary [of Education] may by regulation prescribe as being necessary

for the sale of the articles or services . . . and which may be operated by blind licensees." 20 U.S.C. § 107e(7). Pursuant to this provision, the Secretary has passed regulations including "sanitation practices" as one of the criteria by which agencies may evaluate SLA bids for vending facility contracts. 34 C.F.R. § 395.33(b). Under the RSA, then, sanitation duties are seen as a vital part of vending facilities contracts for which blind vendors should receive priority. As DFA contracts primarily concern sanitation and custodial duties, this definition of vending facilities also counsels in favor of applying the RSA to DFA contracts for services that are integral to running vending facilities.

The Fifth Circuit reached the same conclusion in a virtually identical circumstance, holding that blind vendors should receive priority under the RSA for DFA contracts. *See Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 390–91 (5th Cir. 2020). There, the Army divided its FFS contracts at Fort Bliss, Texas, into two—the first, an FFS contract for which blind vendors continued to receive priority, and the second, a DFA contract for which only small businesses could bid, eliminating Texas's SLA from bidding. *Id.* at 384–85. As here, the question turned on the meaning of the word "operate" in the RSA. *Id.* at 386. After concluding that the term "operate" was ambiguous for the purposes of the RSA, the Fifth Circuit concluded that the statutory context strongly supported construing the word operate to include DFA contracts for services that are integral to the operation of a dining facility. *See id.* at 385–91. Although not binding, the Fifth Circuit's conclusion is persuasive.

Moreover, the Secretary of Education has reached the same conclusion. In a letter to Representative Pete Sessions dated March 5, 2018, then Secretary of Education Betsy

DeVos acknowledged that there had been some dispute over whether the RSA applies to both FFS and DFA contracts. The Secretary expressed the Department's view that the RSA applies to both types of cafeteria contracts, referencing the Oxford English Dictionary definition of the word "operate." She concluded that if "a vendor is responsible for all the functions of the cafeteria aside from those performed by military personnel—such as supervisory, administrative, and sanitation-related functions—the vendor can be said to 'manage' the cafeteria, even if the vendor is not preparing the food." As the Secretary made this comment "in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking," *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000), we treat it with *Skidmore* deference, following its interpretation to the extent it has the "power to persuade," *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). For the reasons stated above, we find the Secretary's broad construction of the RSA persuasive, lending further support to our conclusion that the RSA covers this DFA contract.

Therefore, we conclude that because the DFA contract for Schofield Barracks covered responsibilities that are integral to the Schofield Barracks' cafeteria's operation, the RSA applies and the Army should have given RSA priority to blind vendors for the DFA contract.

## V.

Next, the Army contends that the RSA advance review requirement did not apply to its decision to list the Schofield Barracks food services contract as a DFA contract, while Ho'opono argues that the Army violated the RSA by failing to meet the advance review requirement. We affirm the district court's conclusion that the RSA advance review

requirement applies to the Army's reclassification of Schofield Barracks' dining facilities.

The RSA advance review requirement provides: "Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified." 20 U.S.C. § 107(b). It is undisputed that the Army did not seek approval from the Secretary of Education before reclassifying the Schofield Barracks dining facilities contract as a DFA contract, so this question turns on whether the reclassification constitutes a "limitation on the placement or operation of a vending facility." *Id.*

Examining the plain meaning of the statute's unambiguous terms, we conclude that the Army triggered the advance review requirement when it reclassified the Schofield Barracks dining facilities in a way that eliminated Ho'opono's eligibility to bid on the DFA contract. *See Ahlman v. Barnes*, 20 F.4th 489, 493 (9th Cir. 2021) ("When the statute's language is plain, the sole function of the courts is to enforce it according to its terms." (citation omitted)). This action limited the ability of blind vendors to assert their RSA priority to the Schofield Barracks contract. Thus, the Army violated the RSA by failing to seek the Secretary's approval.

As the statute itself provides no definition for "limitation," we should begin by "consulting common dictionary definitions." *Allenby*, 589 F.3d at 1021. At the time Congress enacted the RSA, the dictionary defined "limit" as "[t]o confine within limits, to set bounds to" and "to bound, restrict." *Limit*, *Oxford English Dictionary* (1st ed. 1933). Obviously, by including the word "any" before

the word "limitation," Congress clarified that *all* limitations fall within the advance review requirement. *See Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (defining "any" to mean "of whatever kind," "[a]s this Court has repeatedly explained [that] the word 'any' has an expansive meaning" (internal quotation marks and citations omitted)); *Kansas ex rel. Kan. Dep't for Child. & Fams. v. SourceAmerica*, 826 F. App'x 272, 285–86 (4th Cir. 2020).

Under the undisputed facts of this case, the Army bounded, restrained, and confined the operation of its Schofield Barracks dining facilities in 2016. By changing the dining facilities contract from an FFS contract to a DFA contract, the Army drastically reduced the scope of services covered under the contract, removed the RSA priority from its 2016–22 contract solicitation, and designated the new solicitation as a "Small Business Set-Aside," which rendered Ho'opono ineligible to bid on the contract. In short, the change to a DFA model led to fewer services and fewer opportunities for blind vendors under the contract—a textbook example of a limitation.

The Army counters that although its reclassification may have been a form of limitation, it nonetheless falls outside the advance review requirement's scope because the limitation did not apply to the "placement or operation of a vending facility." Ho'opono does not dispute that the placement of the Schofield Barracks dining facilities was unchanged, but asserts that the physical location is irrelevant in light of the change in contract from full-service operations to limited-service operations.

Here, a recent unpublished Fourth Circuit decision is illustrative. In *SourceAmerica*, the Fourth Circuit addressed the question we face: whether the military triggered the RSA advance review requirement by reclassifying its dining

services contract from an FFS contract to a DFA contract. 826 F. App'x at 284. As here, this reclassification effectively terminated the military's prior dining services contract with a blind vendor pursuant to the RSA. *Id.* at 284–85. The Fourth Circuit analyzed the RSA advance review requirement's use of the broad term "any limitation," noting that the provision contains "no qualifiers as to the type or degree of limitations." *Id.* at 285. Given that the reclassification of dining facilities "did more than just 'limit' a blind vendor's operation of the vending facility; it eliminated it altogether," the Fourth Circuit concluded that the military was required to obtain DOE's approval before reclassifying the contract. *Id.* at 286. We find the Fourth Circuit's reasoning persuasive and also conclude that a DFA reclassification is a "limitation" under the RSA advance review requirement.

Eighth Circuit precedent also supports our conclusion that a DFA reclassification limits the operation of vending facilities. In *Minnesota Department of Jobs & Training v. Riley*, 18 F.3d 606 (8th Cir. 1994) (*Riley I*), the Eighth Circuit held that requiring blind vendors to pay commissions on their vending sales triggered the RSA advance review requirement, as it limited the vendor's operation of the dining facilities by reducing their total income. *Id.* at 609. Along similar lines, in *Minnesota Department of Economic Security v. Riley*, 107 F.3d 648 (8th Cir. 1997) (*Riley II*), the Eighth Circuit concluded that when a federal agency imposed a condition on an RSA vending machine contract that required the blind vendor to permit the agency to install its own competing vending machines in the same building, this condition constituted a limitation on operations that triggered the RSA advance review clause. *Id.* at 649–50. In both these cases, the Eighth Circuit concluded that restricting a blind vendor's ability to draw income from a

dining services contract—whether by exacting commissions from the vendor or by forcing the vendor to compete with non-RSA vending machines—constituted a limitation on operations. *Riley I*, 18 F.3d at 609; *Riley II*, 107 F.3d at 650. Important to our inquiry here, both these cases assume that an agency limits operations if it limits the ability of a blind vendor to benefit from a services contract. Given that the DFA reclassification here completely eliminated Ho'opono's ability to bid on the contract, the reclassification triggers the advance review requirement, subjecting the decision to DOE approval.

The Army contends that even if it did limit the operation of a vending facility, it did not do so "based on a finding that such placement or operation would adversely affect the interests of the United States," 20 U.S.C. § 107(b), the third statutory predicate to the advance review requirement. However, the record of the Army's decision-making belies this contention. According to the Army, it switched Schofield Barracks from an FFS model to a DFA model because "[w]ith a large number of soldiers returning to Schofield Barracks in 2016, they were able to resume operating the Schofield Barracks dining facilities, making the contract for Full Food Service unnecessary." In other words, the Army determined that staffing its dining halls with its own members for non-DFA functions would be more favorable to its interests than continuing to contract out all dining services under an FFS model—or conversely, continuing to operate under an FFS model "would adversely affect the interests" of the Army given that sufficient numbers of soldiers had returned to the base to allow the switch to a DFA model.

Finally, the Army emphasizes throughout its briefing that it possesses authority over its own operations such that

it can decide how to structure its own contracts, characterizing its reclassification as a "decision about how to employ its own personnel." However, the Army fails to explain how its prerogatives in running its own organization trumps the legislative requirements that Congress has imposed on all federal agencies in the RSA. At no point has Congress limited the RSA so that it does not apply to personnel decisions within an agency's authority—in fact, Congress swept broadly to include "*[a]ny* limitation" on a vending facilities operation. 20 U.S.C. § 107(b) (emphasis added). Indeed, the purpose of regulations like the RSA advance review requirement is to rein in actions that an agency may otherwise be free to take. And the RSA provides that the Army "fully justif[y]" any limitation to the Secretary of Education before it acts, so the Army's argument here was best made to the Secretary, not in litigation after the limitation was imposed. *Id.*

Therefore, we affirm the district court's conclusion that the Army triggered the RSA advance review requirement by reclassifying Schofield Barracks' dining facilities as a DFA facility.

## VI.

For the foregoing reasons, we **REVERSE** the district court's conclusion that the RSA does not apply to DFA contracts, and we **AFFIRM** the district court's conclusion that the RSA advance review provision applies to the reclassification of the Schofield Barracks contract.